UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


```
ALEXIS RICHARDSON, et al.,     .
                               .
          Plaintiffs,          .
                               .  CA No. 13-0508 (JDB)
     v.                        .
                               .
L'ORÉAL USA, INC.,             .  Washington, D.C.
                               .  Friday, October 11, 2013
          Defendants.          .  9:20 a.m.
. . . . . . . . . . . . . . . .
```

FAIRNESS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Plaintiffs:            Halunen & Associates
                               By: MELISSA W. WOLCHANSKY, ESQ.
                               CLAYTON D. HALUNEN, ESQ.
                               1650 IDS Center
                               80 S 8th Street
                               Minneapolis, MN 55402
                               612-605-4098

                               Mehri & Skalet, PLLC
                               By: MICHAEL D. LIEDER, ESQ.
                               1250 Connecticut Avenue, NW
                               Suite 300
                               Washington, DC 20036
                               (202) 822-5100 ext 109

For Objector Holyoak:          Center for Class Action Fairness
                               By: ADAM E. SCHULMAN, ESQ.
                               1718 M Street, NW, No. 236
                               Washington, DC 20036
                               (610) 457-0856

For the Defendant:             Patterson Belknap Webb & Tyler LLP
                               By: FREDERICK B. WARDER III, ESQ.
                               1133 Avenue of the Americas
                               Suite 2200
                               New York, NY 10036-6710
                               (212) 336-2121

```
Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue, NW
                             Washington, DC 20001
                             (202) 354-3186
```

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Your Honor, we have civil action

 3   13-508, Alexis Richardson, et al., versus L'Oréal USA Inc.

 4   Counsel, please approach the lectern and identify yourselves,

 5   starting with the plaintiff.

 6          MR. HALUNEN:  Clayton Halunen for the plaintiff,

 7   Your Honor.

 8          MS. WOLCHANSKY:  Good morning, Your Honor.

 9   Melissa Wolchansky, here for the plaintiffs.

10          MR. LIEDER:  Good morning, Your Honor.  Michael Lieder

11   for plaintiff.

12          THE COURT:  Good morning to all of you.

13          MR. SCHULMAN:  Good morning, Your Honor.  Adam Schulman

14   for objector Melissa Holyoak, and I have at my table with me

15   summer associate Will Chamberlain and another CCAF attorney,

16   Lew Olowski.

17          MR. WARDER:  Good morning, Your Honor.  Fred Warder

18   from Patterson Belknap for L'Oréal, and with me is Kristen Richer

19   from our firm.

20          THE COURT:  Good morning to everyone.

21      So how would you like to proceed?  Are both representatives

22   of the plaintiff and the defendant going to speak to the

23   settlement, or are you not planning to individually speak to it?

24          MR. WARDER:  I think we had planned to speak,

25   Your Honor, unless plaintiff covers everything in support of the
```

1    settlement or unless you have questions.

2              THE COURT:  And then who else would like to speak?

3              MR. SCHULMAN:  I would like to speak, Your Honor, on

4    behalf of Ms. Holyoak.

5              THE COURT:  All right.  So let's do it first by hearing

6    from the plaintiff, and then if you have anything further to say,

7    we'll hear from you.  Then we'll hear from the objectors and then

8    give you a chance to respond to that.

9         Why don't I just throw this out on the table to begin with.

10   I was thinking about this this morning.  Correct this where it's

11   wrong, and then tell me what's right or wrong about this picture.

12        We have a class to be certified that is past purchasers --

13   they're both the salon and mass-marketing purchasers, but past

14   purchasers -- cut off at a June date.  The relief under the

15   settlement would be future injunctive relief that applies to

16   future purchases.  Perhaps some of these class members would have

17   future purchases, perhaps not, but it wouldn't apply to anyone

18   else's purchases.  Well, it would apply to other people's

19   purchases, but they're not members of the class.

20        There's no release of individual damages, but it would seem

21   that any individual would have such low damages that there really

22   isn't a viable, practically speaking, claim for damages that an

23   individual can pursue.  There is a release of class action

24   damages.  Each class representative gets $1,000, and the

25   attorneys' fees are $950,000.

1        So tell me where that's wrong, and then tell me what's right

2    or wrong about that picture.  Let's hear from the plaintiffs

3    first.

4              MS. WOLCHANSKY:  Do you want me to just answer that

5    question to start, Judge?

6              THE COURT:  You start off how you'd like to.

7              MS. WOLCHANSKY:  Okay.  I think --

8              THE COURT:  I mean, if you answer that question, you

9    may satisfy me completely.

10             MS. WOLCHANSKY:  I think you did characterize that

11   correctly.  We would submit that the -- the way you would define

12   the class is by the past purchasers.  That is really, practically

13   speaking, the only way to define the class here.  We couldn't

14   define the class by hypothetical future purchasers of --

15             THE COURT:  If there's only injunctive relief, if there

16   was no release of damages, why couldn't you?

17             MS. WOLCHANSKY:  Why couldn't we...

18             THE COURT:  What does it matter how the class is

19   actually defined if it's just an injunction?  Because it would

20   benefit them anyway.

21             MS. WOLCHANSKY:  Your Honor's right.  It's benefitting

22   the future purchasers; it's benefitting the past purchasers by

23   the removal of the language.  So it entirely cures the

24   allegations in the complaint.  So we did it by the statutory

25   period in order to go backwards and give due process rights to

1    the people who are in the past because those were the only people

2    who we know purchased the products.  As far as moving forward,

3    future purchasers will benefit because they will be shielded from

4    this deception.

5              THE COURT:  But they're not class members.

6              MS. WOLCHANSKY:  They are not technically class

7    members, exactly, because we amended the class definition to make

8    sure the people who received notice were the people who were the

9    class members so that if they had any objection, they could raise

10   it here before Your Honor.

11      Would you like me to proceed with addressing the other

12   objections?

13             THE COURT:  Well, you also have to tell me why that's

14   good or bad -- and that's what you're now going to be doing --

15   with respect to (b)(2) or (b)(3) class.  I mean, I have some

16   problems with that picture.  I just think you need to know that

17   I have some problems with that picture.

18      We have a class that is releasing the only conceivable

19   damages awards -- whether or not it's claimed in the complaint --

20   the only conceivable damages awards that could ever be available,

21   doesn't appear to me that they're totally incidental, and is

22   getting very little here because they're not getting any direct

23   relief related to their past purchases.  They're only getting

24   some future injunctive relief relating to speculative purchases

25   that they may engage in.

1        So I really see the plaintiffs winding up with close to

2    nothing except they're releasing any damages claims and they're

3    retaining individual damages claims that really amount to close

4    to nothing, literally and practically, and the only thing that

5    the class action is really accomplishing, except for this future

6    injunctive relief that affects anybody who purchases things, is

7    the awards to the class representatives and the attorneys' fees.

8        That's not the picture that one really usually envisions for

9    a class action -- no relief really falling to the plaintiffs --

10   and that seems to be the picture here.  Tell me why these

11   plaintiffs are really getting any benefits.

12           MS. WOLCHANSKY:  So when we initially brought this

13   action, we spent almost a year investigating this case before we

14   initially filed it, and we too thought that this was going to be

15   a certifiable (b)(3) class with money damages to the class

16   members.  What we learned is that, in fact, these class members

17   have not been monetarily damaged.  We thought that they paid a

18   premium.

19       We thought L'Oréal was diverting the products into the mass

20   market so they could make more money, they could charge a premium

21   for these products.  Because people thought it's a salon product,

22   they'd buy it for that reason, they'd pay more money for that

23   reason, and we thought that we could recover that for the class

24   members, you know, either the purchase price if that's the reason

25   why they bought it, or the difference in the premium price.

1    What we learned through -- and we did our due diligence

2    here.  We did confirmatory discovery; we have sworn testimony

3    from L'Oréal -- was that in fact there isn't a premium price.

4    They aren't charging a premium price, and consumers aren't paying

5    a premium price.  So while in theory you would think, Why

6    shouldn't the class get money?  Because here they really aren't

7    damaged monetarily.

8        Now, they are misled.  They are named plaintiffs, you know,

9    purchased the products for many reasons, perhaps the "salon"

10   language being one of them, but they didn't pay anything more for

11   that salon purpose.  We thought that they did, and we would have

12   been well off if we were able to seek a (b)(3) class here, but

13   what we learned from L'Oréal was that that's just simply not the

14   case.

15       To address the past purchaser/future purchaser issue, this

16   has been -- and we cited in our brief a few cases out of

17   California, and there was a case here in this district, the

18   Cohen v. Chilcott case that kind of addressed this past-purchaser,

19   future injunctive-relief value issue, and practically speaking,

20   there just isn't a better way to define the class.

21       But here, this is not a case where there's a defect in the

22   product or there's an issue with product performance and people

23   bought it and they thought, you know, I've been duped and I'm not

24   going to buy this again.  That's not what we have here.

25       In the Delarosa v. Boiron case -- and I think we cited some

1    others, the <u>Mason-Innovative</u> case -- the court kind of addressed

2    this issue.  If it's something like a homeopath product where the

3    class buys it, they think it's going to cure their sickness and

4    they learn it just doesn't work, future injunctive relief is not

5    going to benefit them, because they're not going to buy it again.

6    But in a case -- and I think in the <u>Boiron</u> case they talked about

7    natural food that's mislabeled.

8             THE COURT:  When you say -- excuse me for the

9    interruption, but when you say they didn't really pay anything

10   more, do you mean that literally?  So not only isn't there really

11   much in the way of an individual damages claim that could be

12   brought, but when you aggregate that in terms of any class

13   damages, it really amounts to zero.  I read the settlement from

14   the defendant's perspective as having an important provision

15   which is a release of class damages.  Are you telling me that's

16   a release of zero?

17            MS. WOLCHANSKY:  The only way that we felt that we

18   could release the class-wide claims is because we did our due

19   diligence, and we know there are no viable class-wide monetary

20   damages here.  On a (b)(3) class, we would not be able to seek

21   damages.

22       Now, there may be an individual who thought, you know,

23   I purchased this, and this is the only reason I bought it and

24   I think I was damaged.  That individual could bring a case under

25   the settlement.  But as far as certifying a (b)(3) class,

1    class-wide, why did people purchase it?  Did they all purchase it

2    for the salon-only reason?  Did they uniformly get charged that

3    premium price across the board?  We learned no.  Sometimes in

4    salons they pay --

5              THE COURT:  As opposed to the representation

6    that you're making here, do I have a record before me that

7    establishes, so that I should be satisfied with it, that there

8    are no individual or, therefore, class-wide viable damages?

9    Is that in the record so that I can be satisfied with that?

10              MS. WOLCHANSKY:  Yes.

11              THE COURT:  So that this release of class action

12   damages is not a release of anything meaningful?

13              MS. WOLCHANSKY:  Yes.  We provided sworn testimony

14   from L'Oréal, and I believe it was the declaration of

15   Mr. Perenty.  Mr. Warder can -- there are a few declarations that

16   were submitted by L'Oréal, but I believe it was the declaration

17   of Mr. Perenty.  He swore in his declaration that L'Oréal has

18   never sought to determine what the salon-only representation

19   means to consumers.  So they didn't do market research to figure

20   out what they can charge because what does that mean to people,

21   and that they don't in fact charge a premium price for that

22   salon-only representation.

23       So in order for us to have class-wide monetary damages,

24   the class would have to be damaged uniformly across the class.

25   We would have to be able to calculate their damages on a

1   class-wide basis, and in the L'Oréal sworn declarations, we

2   learned that in fact, no, they don't do that.  They don't

3   uniformly increase the purchase price.  The MSRP is not affected

4   by the salon-only representation.

5        THE COURT:  And that's marketing purchasers.  They have

6   no monetary --

7        MS. WOLCHANSKY:  I'm sorry, I didn't hear you.

8        THE COURT:  There aren't only salon plaintiffs, right?

9        MS. WOLCHANSKY:  Right.  It's salon and mass -- the

10  MSRP, it's not affected by salon or mass retail by the salon-only

11  language.  That is in the record.

12       THE COURT:  Okay.  Go ahead.

13       MS. WOLCHANSKY:  So this notion of past/future

14  purchasers, we have past purchasers who weren't just duped and

15  won't buy it again because fool me once you won't fool me again.

16  This is a case where purchasers are buying these products -- and

17  we learned this in discovery with L'Oréal during the mediation

18  process.  They buy these products for a whole host of reasons.

19       They buy it because of brand equity, which is huge in this

20  case, which is why we believe that the future injunctive relief

21  really is valuable.  They buy it because they like what it does

22  for their hair.  They buy it for a number of reasons, including

23  whether or not it's a salon-only product.  But it's not like

24  with, for example, a homeopath where you know that it doesn't

25  work so you aren't going to buy it again.

1          Here there is brand equity.  In the Delarosa v. Boiron case,

2     the court found that like with a natural product that's maybe

3     labeled "natural" and it's misleading, once that deception is

4     removed and consumers know that they can truthfully buy the

5     product, there's a likelihood that they will continue purchasing

6     it in the future.  That's what we have here.  We have past

7     purchasers who have, once the deception is removed, a likelihood

8     of buying it again and then a likelihood of being deceived again

9     if it's not removed.

10         Again, in this district, the Cohen v. Chilcott case, it's

11    not exactly factually on point, but they gave products instead of

12    money to the class, and the products were going to future users

13    and perhaps some past users as well, but not all past users.  So

14    it was injunctive relief and products that would benefit a future

15    class of people that would include past purchasers as well.

16         So we think here there's enough of a nexus between the past

17    and the future purchasers that makes this class definition and

18    the injunctive relief valuable.  And just practically speaking,

19    I mean, getting rid of corporate malfeasance and removing

20    deception here has value, and there's no better way than using

21    past purchasers as the class to effectuate a settlement and cure

22    the deception.

23         Are there any other questions Your Honor has for me, or do

24    you want me to address the other objections?

25              THE COURT:  Either address them now, or you're going to

1    address them after they speak.  So go ahead and address them to

2    some extent now.

3         MS. WOLCHANSKY:  Okay.  As Your Honor knows from the

4    papers, but just to reiterate, this was not a case that was

5    quickly filed, quickly settled without thought to the class

6    members' relief.  This was a hard-fought mediation.  We submitted

7    a declaration --

8         THE COURT:  The case has gone on for a while, but it

9    did start off as a (b)(3) damages case, as you just stated.

10        MS. WOLCHANSKY:  It did.

11        THE COURT:  It has the appearance at least of, whoops,

12   we can't go anywhere with this (b)(3) case; let's figure out a

13   way to get something out of this case through a (b)(2) model.

14   That's sort of the appearance and the history here.

15        MS. WOLCHANSKY:  So we originally filed it, like

16   I said, as a (b)(3) class, believing in fact that there were

17   monetary damages to be had by the class.

18        THE COURT:  I have no doubt about that.

19        MS. WOLCHANSKY:  And when we learned that there

20   weren't -- and we engaged in early discovery with L'Oréal --

21   we learned that there weren't, we still felt strongly that there

22   was deception here.  And that is exactly why the consumer fraud

23   statutes exist, to protect consumers, and we knew that the

24   salon-only language was misleading.  We knew it wasn't true.

25   Whether or not L'Oréal was diverting the products into the mass

1    market is irrelevant.  The language on the bottle was misleading.

2        So we felt that this was a case worth pursuing, because

3    corporate defendants shouldn't be allowed to just put misleading

4    language on their products, on their bottles, on the front of

5    their food products, and get away with it because there isn't a

6    premium.  It was misleading, we wanted to cure that, and we

7    believe we've done that here.  And it was through hard-fought --

8    I mean, this was not easy.  This was a full 10-hour day just with

9    the mediator to discuss the injunctive relief.

10       The attorneys' fees, the incentive payments, those were

11   never discussed until this injunctive relief was secured for the

12   class.  There were many weeks following the mediation.  This was

13   not easy to effectuate.  We're talking about going to the highest

14   levels of L'Oréal powers to get this done.

15       It affected international production of the products and

16   really is a big change in the marketplace for L'Oréal to remove

17   this deception.  Again, may not have a monetary value, but

18   certainly has a big impact on the marketplace.  So through these

19   hard-fought negotiations, we were able to get this injunctive

20   relief for the class, and only after that did we start talking

21   about attorneys' fees.

22       I anticipate an argument from Mr. Schulman that this should

23   be a constructive common fund, that what we have here is a pot of

24   money that we should be dividing up between the class members,

25   between the attorneys' fees and notice to the class.  This is not

1    a constructive common fund.  We're not talking about money that

2    should go to the class and how can we give them pennies on the

3    dollar to get some money to the class.  This is a case where

4    there are no money --

5              THE COURT:  Because they have no monetary harm.

6              MS. WOLCHANSKY:  On a class-wide basis, they have not

7    been monetarily harmed.  So what Mr. Schulman will suggest to you

8    is that we take this pot of money -- and he's told us that this

9    is what he's going to tell Your Honor, so maybe he'll surprise

10   me, but if we take $500,000 and we say we're going to give that

11   to the class, that's what he's going to ask you to do.

12       Let's take $250,000 and put it through claims administration

13   and notice, which, if you're talking about sending out checks to

14   one or two hundred thousand people, I can tell you that's not

15   going to be enough money.  But let's just put that aside and talk

16   about this $500,000 that we're going to give to the class,

17   because what Mr. Schulman will tell you is they're here for the

18   consumer and they want to get the money to the consumer.

19       If we look at L'Oréal's diverted sales alone, because those

20   are public and I can share those today -- the sales numbers are

21   confidential.  But the diverted sales, ACNielsen data, if we talk

22   about a $500,000 pot at a 1 or 2 percent take rate, which is

23   incredibly low and we would argue it would be higher than that,

24   we're talking, on the diverted sales number, under a dollar to

25   the consumers.  And that's only a fraction of L'Oréal's real

1    sales.  So if we're talking about their real sales, we're really

2    talking about delivering pennies to consumers under this

3    constructive common fund.

4            THE COURT:  Are there class actions that wind up with

5    figures that low being delivered to consumers?

6            MS. WOLCHANSKY:  Like pennies on the dollar?

7            THE COURT:  Yes.

8            MS. WOLCHANSKY:  I'm not aware of any.

9            THE COURT:  Less than 10 dollars.

10           MS. WOLCHANSKY:  I'm not talking -- yes, I think less

11   than 10 dollars.

12           THE COURT:  Less than five dollars.

13           MS. WOLCHANSKY:  I'm not --

14           THE COURT:  I think so, probably.

15           MS. WOLCHANSKY:  Maybe less than five dollars.

16   But less than 50 cents?

17           THE COURT:  I don't know what the answer is.

18           MS. WOLCHANSKY:  I mean, the cost to administer --

19   and actually, in the Cohen v. Chilcott case the court does talk

20   about that.  The cost to administer the settlement, to notice it,

21   to actually like have the claims administrator write the check

22   and put it in the mail, you have to look at the equity of that.

23   If it's costing more money to send out a check to consumers who

24   are going to get 41 cents, or maybe even less than that, that

25   isn't equitable either.

1      So the practicality of this breaking up the constructive

2   common fund as they would call it, that, practically speaking,

3   doesn't make any sense, we of course would submit, because there

4   isn't any money owed to the class.  But also on a practical

5   level, that just isn't going to help consumers either.

6      So this notion of a constructive common fund, all we've done

7   here is secured injunctive relief that we believe is incredibly

8   valuable to consumers -- past consumers, the marketplace, future

9   consumers, but to the class -- and we're asking to essentially

10   recover the time that we've put into the case.

11      We didn't submit some astronomical valuation of the

12   injunctive relief, because we couldn't do that, because to do

13   that, for the very reason that we aren't able to identify any

14   class-wide monetary damages here for the class members, we

15   can't value the injunctive relief in terms of dollars and cents.

16   But that does not mean that it's not valuable.

17      So what the court has said -- and they rely heavily,

18   the objector, on the Bluetooth case.  What the Bluetooth case

19   says is that the lodestar multiplier approach is appropriate when

20   it's a primarily injunctive relief settlement like we have here.

21   In the Bluetooth case, I know they'll talk to you about the

22   Bluetooth case and the constructive common fund --

23            THE COURT:  Did the Bluetooth case chase you out of the

24   9th Circuit?

25            MS. WOLCHANSKY:  No.  It did not.  I will stand here

1    and tell you that that is absolutely not what chased us out of

2    the 9th Circuit, and I don't think Bluetooth has any effect on

3    this case.  What happened in the Bluetooth case is the district

4    court failed to look at the lodestar approach, failed to say I'm

5    using a common-fund approach.  The court just basically said, oh,

6    you agreed to the fees?  Sounds good to me.

7         That's not what we're asking you to do, and I don't believe

8    Your Honor would do that here.  We have submitted that we are

9    asking here for our lodestar and a multiplier.  That is the

10   approach we're asking Your Honor to take.

11        We are not creating some hypothetical constructive fund with

12   some money here, some value of injunctive relief here and saying,

13   here's this massive pot; please give us a percentage of that.

14   No.  We're asking to be paid for the time we put in, taking this

15   case on a contingent basis, on behalf of the class --

16             THE COURT:  What's the multiplier?

17             MS. WOLCHANSKY:  The multiplier is de minimis.

18   I think it's something like 1.01.  So we're essentially asking

19   for our time in the case.  So this notion that a lodestar

20   multiplier is inappropriate, the Bluetooth court and other courts

21   in this jurisdiction have said it's really hard to identify any

22   other way to value reasonable attorneys' fees in an injunctive

23   relief-only situation.  So we would submit that looking at our

24   time plus a small multiplier would be the correct approach to

25   determine the fairness.

1        THE COURT:  Do you have a technical standing problem

2   here with the named plaintiffs in terms of having standing to

3   seek injunctive relief given the fact that this is future

4   injunctive relief?  It's really conceptually based on future

5   purchases, but they now know everything.  There's no possible

6   deception with respect to them, so why do they have standing to

7   seek and obtain the only relief that's going to be obtained here

8   which is this future injunctive relief?

9        MS. WOLCHANSKY:  I addressed this a bit earlier, but

10  it's along the same lines as why the future injunctive relief is

11  valuable to the class as past purchasers, and there are a line of

12  cases in California.  I believe that the objector said --

13       THE COURT:  You're sending me to California.

14       MS. WOLCHANSKY:  I know, because we need to bring

15  more cases to D.C.  There aren't enough litigated here on this

16  matter.  But the Chilcott case I believe is instructive here to

17  show that there is standing by past purchasers for future relief.

18  The Chilcott case is a perfect example in this district.  But

19  it's this notion that if there is a possibility that you could be

20  harmed again in the future, the corporate -- and there is a

21  possibility that the named plaintiffs could be harmed in the

22  future.

23       THE COURT:  What's the harm?

24       MS. WOLCHANSKY:  The corporate structure changes

25  constantly.  It's possible that L'Oréal could -- and first of

1    all, this is what we alleged in our complaint.  It's unclear

2    when you buy a product at Walmart, at Kmart, at Target, why

3    those products are able to be on those shelves.  Maybe they have

4    a corporate salon.  You know, it's not up to the consumer to

5    understand on a corporate level how the marketplace works.

6         So it's possible that corporate Walmart could get a salon.

7    You know, there are some of these big-box stores that do have

8    salons on site, and for a consumer at the point of purchase, to

9    know or to have to investigate whether or not that's the case

10   isn't really fair to do to the consumer.

11        So it's possible that either L'Oréal could enter into some

12   contractual relationship with Target or Walmart that allows those

13   products to be sold because they have some corporate salon or

14   something like that.  So it's possible that the named plaintiffs

15   don't have information about any arrangement like that that

16   L'Oréal has, and they could in fact be harmed in the future.

17             THE COURT:  You know, I don't really like these

18   standing arguments that turn on, Well, geez, it's possible

19   that...  It's possible that...  That seems like a pretty thin

20   reed to build your standing argument on.

21             MS. WOLCHANSKY:  I mean, I think the cases

22   in California that talk about this possibility -- it is the

23   possibility of being harmed again in the future.  There is a

24   possibility that the named plaintiff could be harmed in the

25   future, and that, we would submit, is enough for standing.

1        THE COURT:  That possibility that you're talking about

2    is a possibility of injury in fact.  What about redressability

3    since the injunctive relief doesn't really address injuries that

4    the plaintiffs have actually suffered?  So all the redressability

5    is about injuries, that notwithstanding their pretty full

6    knowledge now, they could suffer in the future if they go ahead

7    and purchase notwithstanding that knowledge?  I don't understand

8    it, quite frankly.

9        MS. WOLCHANSKY:  Well, we think it does benefit the

10   past purchasers because when they purchased the product with

11   the salon-only language at the point of purchase, they believed

12   that that was true.  Now that that deception is removed, they can

13   go there, look at the product, know that it's not a salon-only

14   product, and they can make the choice to purchase it again.

15   And if they do purchase it again because of --

16       THE COURT:  It doesn't redress a past injury; it's

17   redressing a speculative future injury.

18       MS. WOLCHANSKY:  It's redressing a past injury because

19   they bought it and they were misled, and now they aren't going to

20   be misled again.  They know.  Without compensating them

21   monetarily, if we could go backwards in time and tell L'Oréal to

22   take that off the bottle so nobody was ever harmed in the past,

23   we would love to do that if I had a time machine.  But

24   unfortunately, practically speaking, the best way to help the

25   past purchasers who are -- I mean, we submitted a declaration

1    from the --

2          THE COURT:  I understand what you're saying, but in

3    the standing world, that doesn't necessarily -- you know, the

4    fact that you can't do this or you can't do that doesn't

5    necessarily create standing.  Usually in these (b)(2) class

6    settings with the future injunctive relief, you're talking about

7    a continuing relationship structure, civil rights structure more

8    often, and that doesn't fit perfectly here.

9          MS. WOLCHANSKY:  No.  It may not fit perfectly here,

10   but it fits as best as it could in any of these consumer cases

11   because we have brand equity, we have the objector who herself

12   purchased this over many years, we have named plaintiffs who

13   purchased this over many years, and as far as a continuing

14   relationship goes, on a consumer level -- and there are cases --

15   again, bringing us back to sunny California, which we probably

16   wish we were there today with this lovely weather that we have --

17   it would absolutely make it impossible to ever stop corporate

18   malfeasance with mislabeling if we couldn't change the practice

19   in the future.

20         THE COURT:  Unless there's some monetary damages

21   which --

22         MS. WOLCHANSKY:  Unless there was monetary damages.

23         THE COURT:  -- even gives the avenue through class

24   actions.  We're only talking about in this situation where

25   there's, from your statements, zero in terms of monetary impact.

1    It makes it a little more difficult.

2    MS. WOLCHANSKY:  It may make it more difficult, but

3    it doesn't mean that it is any less appropriate under Rule 23.

4    THE COURT:  So long as this release of damages,

5    that I'll hear whether that's a key provision in this settlement,

6    you're saying it's a meaningless provision because there are no

7    possible damages, class-wide or individually.  Even though

8    there's no release of individual damages here, you say that

9    that's some meaningless provision, basically.

10    MS. WOLCHANSKY:  I'm not saying it's meaningless.

11    I'm saying there are no -- as plaintiffs' counsel, our fiduciary

12    obligation is to the class.

13    THE COURT:  Releasing zero is pretty meaningless,

14    quite frankly.

15    MS. WOLCHANSKY:  If we thought there were all these

16    class-wide monetary claims, we would not be upholding our duties

17    to the class by getting rid of them without giving any money to

18    the class.  We're releasing them because we do not believe that

19    there are any viable claims.

20    I'm sure that Mr. Warder will tell you why it's valuable in

21    terms of the settlement, because in order to remove the deceptive

22    language and get this injunctive relief for the class, L'Oréal

23    didn't want to be explaining the same thing to future plaintiffs'

24    counsel that there are in fact no viable monetary claims.  So

25    it's more of an issue on the defense side and why that was

incorporated into the settlement.  We don't believe we're
releasing anything that the class members have of value, but
that doesn't mean it doesn't have value to the settlement.

Other objections.  This notion -- and Your Honor mentioned
the incidental nature of the damages.  We don't believe they're
incidental.  There simply aren't any monetary damages here, so
they're not incidental; they're not consequential.  The objector
herself, in her sworn declaration -- she's an attorney.  She
works for the Center for Class Action Fairness.  She knows how
this works.  She hasn't alleged that she suffered any damage.
She hasn't suggested any way to value her damage or relief to the
class.

Mr. Schulman's suggestion that we break up $500,000 and give
it to consumers still doesn't explain how these consumers were
damaged or why that 10 cents redresses their deception for the
salon-only claims.  So the monetary damages predominance argument,
we just don't think that it has any legs.

We've requested attorneys' fees in this case.  We believe
that the lodestar multiplier is the appropriate way to determine
whether the fees are reasonable.  Like I explained earlier, this
is not a natural case that are 400 out there and we threw some
stuff on paper and we thought will this stick.  This is a case
that we extensively researched, long before it was ever filed,
to fully understand the effects of diversion in the marketplace.

We have consulted with experts to look at these very issues

1    that we're faced with here today, issues of class certification,

2    whether or not this is across-the-board why people buy these

3    products to really fully understand how diversion works in the

4    marketplace, it's a very complicated issue and it's massive, and

5    L'Oréal can talk to that.  But the attorneys' fees here are to

6    bring this case to the point we are today.  We submit they are

7    reasonable, and we believe that looking at our time and adding a

8    very modest multiplier is appropriate here.

9            THE COURT:  This is not on the exact point you were

10   just raising -- it's not on that point at all, just returning to

11   some earlier points.  The cases that you rely on for past-

12   purchaser classes in injunctive-only cases, are those (b)(2) or

13   (b)(3) cases?  Do you have a (b)(2) past-purchaser, injunctive-

14   relief-only case that you --

15           MS. WOLCHANSKY:  Where it was certified as a (b)(2)?

16           THE COURT:  Yes.

17           MS. WOLCHANSKY:  I could answer that twofold.  I don't

18   believe that I have one, and I don't believe that there's one the

19   other way.  I don't know that --

20           THE COURT:  This would be fairly novel in that it would

21   be certifying a class under (b)(2) that is past purchasers and

22   the only real relief is future injunctive relief.

23           MS. WOLCHANSKY:  In these consumer cases, they are

24   typically (b)(3) classes.

25           THE COURT:  Maybe there's a reason for that.

1          MS. WOLCHANSKY:  I think the reason for that is because

2     there are identifiable monetary issues.

3          THE COURT:  And maybe if there are identifiable

4     monetary issues, there's a problem.

5          MS. WOLCHANSKY:  No, there aren't identifiable monetary

6     issues here; but that doesn't mean it isn't a violation of the

7     consumer fraud statutes, and that doesn't mean there hasn't been

8     class-wide deception.  So the (b)(2) vehicle is appropriate here

9     because there aren't monetary damages.

10      There are (b)(2) classes I'm sure that are certified with

11    monetary relief incidental, whether it's money or injunctive

12    relief, but it's typically the (b)(3) vehicle that they use

13    because it's easier when you have monetary damages to prove that

14    they're not incidental.

15      I'm sure that Mr. Schulman will talk about the Dukes case

16    and why the Dukes case says that monetary damages are incidental.

17    The Dukes case is entirely inapposite here.  Those individuals

18    had individual backpay that they were owed, and we're talking

19    about money that they were owed.  Here we know that there is no

20    money owed to the class members.

21          THE COURT:  And it turns on this assessment of the

22    damages as being zero.

23          MS. WOLCHANSKY:  Correct.

24          THE COURT:  Whether individual or collective.

25          MS. WOLCHANSKY:  Correct.  I can talk about why we

1   think certification is appropriate.  We've briefed that.  I don't

2   know if you want me to walk through the factors of numerosity,

3   commonality, typicality.

4           THE COURT:  I don't think you have to walk through all

5   of that.  If you think there's some vulnerability from some

6   objections made, you can highlight that or you can respond to

7   anything that's raised here, or I will rely on the papers as they

8   addressed those issues.

9           MS. WOLCHANSKY:  I think the main issue that was

10  raised is whether or not a (b)(2) is appropriate here.  It's not

11  necessarily as to any of the individual elements, and it kind of

12  falls on that issue of whether or not the damages are incidental.

13  I think I've spoken to that, and I think we've really heavily

14  briefed it as well.

15          THE COURT:  There's no other definition of the class,

16  in your view, that would give rise to any possible class-wide

17  monetary relief, because there just is none.

18          MS. WOLCHANSKY:  There just is none.

19          THE COURT:  Although you've indicated that there may

20  be an aberrant consumer who could argue that they had some real

21  monetary exposure, but you don't know what that is.

22          MS. WOLCHANSKY:  We were not going to release their

23  individual right to bring a claim, because we thought that that

24  was beyond what we can do under the law.

25          THE COURT:  For class purposes.

```
 1              MS. WOLCHANSKY:  For class purposes.

 2              THE COURT:  There's no other definition that you

 3    believe would raise some monetary relief out of what you feel

 4    is nothing.

 5              MS. WOLCHANSKY:  Exactly.  We could do it six months

 6    ago.  The class could be six months.  The class could be four

 7    years.  It doesn't matter, because across the board, L'Oréal has

 8    not charged and consumers haven't paid any premium, and they

 9    haven't been monetarily damaged on a class basis.

10              THE COURT:  And it's your view that there's no

11    difference in monetary exposure between salon purchases and the

12    mass-retail purchases.

13              MS. WOLCHANSKY:  Correct.

14              THE COURT:  All right.

15              MS. WOLCHANSKY:  Unless you have any other questions.

16              THE COURT:  Let's leave it there for the moment.

17              MS. WOLCHANSKY:  Okay.  Thank you.

18              THE COURT:  Let's hear from L'Oréal on anything that

19    you think needs to be addressed and reinforced, and convince me

20    why there is no monetary exposure here as based on the record

21    before me.

22              MR. WARDER:  Thank you, Your Honor, and I will start

23    there.  There is a record before you.  There are three different

24    sworn declarations from L'Oréal talking about the marketplace and

25    how it is that diversion takes place.
```

1       The whole question in this case is whether or not any group

2   of plaintiffs -- these folks or any others -- could prove class-

3   wide damages, and I think it's because this market is very poorly

4   understood that groups like plaintiffs have an idea that they

5   could prove some kind of damages.

6       Your Honor posited this question as whether or not the

7   claim that is being released is meaningful.  I would twist it

8   slightly and say, is it valuable?  It is virtually valueless to

9   plaintiffs that class-wide claim for monetary damages, but it has

10  value to L'Oréal because L'Oréal has already beat a class on this

11  salon-only type arrangement once from salon owners.  We thought

12  we had put to bed the issue of salon-only claims and diversion.

13      Plaintiffs' class came along saying, no, we don't quite

14  understand it; we think there still is a damage claim for us.

15  From L'Oréal's point of view, if it does not get a release of

16  class-wide monetary damages, it's going to be in the position,

17  time after time, of having to explain and educate this, or else

18  litigate through and get a rejection of class certification and

19  rely on that as collateral estoppel.  So one way or the other,

20  L'Oréal is going to have to put this to bed.

21      So the choice facing L'Oréal was whether or not to simply

22  fight this on class certification grounds, or is there a way to

23  reach a settlement that will benefit its customers that will

24  satisfy plaintiffs' class and that will eliminate the need to go

25  through the expense and disruption of having to demonstrate again

1   why there are no class-wide damages here.

2           THE COURT: Whose class-wide damages are being released?

3           MR. WARDER:  All purchasers during the class, whether

4   they bought in salons or in retail.  And certainly if we were to

5   have fought class certification, we would have identified the

6   fact that -- and did during the mediation.  We believe the

7   mediator's declaration outlines all of the arguments we made

8   to him and to plaintiffs' counsel in connection with class cert.

9   There can be no injury because there can be no misleading of

10  plaintiffs, of consumers --

11          THE COURT: What about the class-wide damages that might

12  have been incurred -- I know you think it's zero, but you're

13  concerned about it so let's talk about it -- of purchasers from

14  June until, let's assume next month when this settlement is

15  approved?

16          MR. WARDER:  There is going to be a window, Your Honor.

17          THE COURT:  You have some exposure there.

18          MR. WARDER:  There is a window.  It's going to take

19  us time to change those labels, so there is going to be some

20  exposure there.  We think that is minimal exposure and are

21  willing to take that risk.  All this time, these claims have been

22  on these bottles for decades.  There's been diversion for more

23  than a decade.  This is the first time anybody has ever

24  challenged it.  We happen to believe it's because of --

25          THE COURT:  I thought you said you already beat down

1    one class action.

2            MR. WARDER:  That's what I was about to identify,

3    Your Honor.  That class action was from salon owners, not

4    consumers.

5            THE COURT:  But it was still a complaint about labels.

6            MR. WARDER:  It was.  It was about these labels.

7    It was very well publicized.

8            THE COURT:  I'm just reacting to your saying this is

9    the first time anyone has ever challenged those.

10           MR. WARDER:  First time any consumers have ever

11   challenged it.  And I'm focusing on that, Your Honor, because

12   it's this window of consumers that you're asking me about between

13   the end of the class and when the labels are changed.

14       So in looking at that and assessing whether or not that's a

15   risk, obviously there's some risk for L'Oréal, but because this

16   is the only group of plaintiffs who's ever challenged these

17   claims during their history, we think that's a minimal exposure

18   and a risk we're willing to take.

19       Our alternative is to continue to fight class cert in this

20   case or any others.  This seemed like the closest way of getting

21   finality without disruption to the client, without disruption of

22   its businesses, to go through class discovery and then class cert

23   briefing.

24           THE COURT:  So for you, the provision on release of

25   class-wide damages claims is an important provision.  Even though

1    for the plaintiffs it might be giving up zero, for you it's

2    important.

3            MR. WARDER:  Exactly my point.  It might be valueless

4    to them.  It's valuable to us, and without it we're certainly not

5    going to agree to any class settlement.  So they are not going to

6    get this injunctive relief without that release-of-damages claims.

7    So for them, they're weighing the injunctive relief has value,

8    the class-wide damages claims do not, and so that is the benefit

9    I understand --

10           THE COURT:  This all turns on my being satisfied, based

11   on the record, that the monetary assessment of the value of those

12   class-wide damages claims is basically zero.

13           MR. WARDER:  It's both of those things, Your Honor,

14   both that the monetary damages are zero, and that they could

15   never get a class certified.  It's a very important aspect of

16   this.  Might there be one consumer out there who could persuade

17   you or some other fact-finder that that consumer had not known

18   about diversion, had not known that these products were available

19   in mass-market outlets, had bought these products exclusively or

20   predominantly because of this claim, had paid more than they

21   might have paid in their region in order to get that and would

22   not have otherwise bought this product except for this claim?

23   Might there be one consumer out there like that?  Could be.

24           THE COURT:  And bought the product a lot, so the

25   damages would add up.

1          MR. WARDER:  Exactly, Your Honor.  I actually have

2     copies of the label.  I think it would be helpful for Your Honor

3     to see this.

4          THE COURT:  Sure.

5        (Document passed to the Court.)

6          MR. WARDER:  Thank you.  Your Honor, what I'm showing

7     you are copies of the labels of the two products that the

8     objector's client says that she purchased, and they are

9     representative of these professional hair care products.

10         You'll see, if you look at the All Soft -- it's the browner

11    of the two.  If you look at the back of the bottle, this is the

12    back of the bottle.  Underneath the white UPC code block, you'll

13    see in tiny print, it says, "Exclusive Salon Distribution."

14    That's the claim that's at issue.  If you look at the Blonde

15    Glam, which apparently she bought multiple times, again,

16    underneath the box you'll see "Guaranteed Only in Salons."

17    That's the claim at issue.

18         So the argument here is that there is a class of people who

19    could prove that these claims were either material or that they

20    relied on, depending on the cause of action and whether that's an

21    element, or even if it's not an element, that it caused them to

22    purchase and thereby their injury, and that they paid more for

23    this product than they would have, and that they got nothing of

24    value.

25         Remember, Your Honor, this is not a case in which there is

1    any allegation that the product did not perform as advertised

2    or expected, not defective, nor an over-represented product.

3    So they obviously got something of value.

4         And trying to figure out from a class-wide approach what

5    their damages are, based on whether they were either overcharged

6    or not, which is the subject of the testimony in front of Your

7    Honor, or whether they got something that was slightly less

8    valuable although admittedly valuable when they purchased this

9    product, trying to prove that measure of damages across a class

10   will be impossible.

11        It's for that reason -- and we actually spent a lot of time

12   educating plaintiffs' counsel about this.  We gave over about

13   2,000 pages of documents --

14             THE COURT:  You said "educated."  The objectors

15   apparently haven't been.

16             MR. WARDER:  Your Honor, we say that, but that's

17   actually an important point, because I did not see the objectors

18   ever ask for access to any of these facts, the underlying facts

19   that show the impossibility of certifying this class.  That to me

20   is quite important, because that is the investment that our client

21   has put into --

22             THE COURT:  But they have access to the record that's

23   before me.

24             MR. WARDER:  They sure do.

25             THE COURT:  And that record is what I have to rely on

1    to reach that conclusion.

2           MR. WARDER:  That's right, Your Honor.  It only goes to

3    whether or not this objection is really based on facts relating

4    to this class or whether it is a more academic and theoretical

5    objection.  Our position is that it is the latter.

6        I think I've talked about the reasons why there would be

7    little to zero likelihood of class certification, and even if

8    there were, the impossibility of proving damages from a

9    class-wide perspective.

10       I suppose the only other thing that we as defendants ought

11   to address preemptively is this suggestion in the papers,

12   although it's never outright alleged, that there's some kind of

13   collusion here.  There was certainly no collusion.  We did not

14   want this suit, didn't seek it.  As soon as it was filed, we

15   agreed to mediation because we wanted to explain how diversion

16   works.  It's not intuitive, and I'm happy to explain to Your

17   Honor how this market works.

18       In a nutshell, it works in that defendant sells these

19   products to distributors, to salon wholesalers, and sometimes

20   directly to salons, although rarely.  And it's a flat price.

21   The product is then out there in the marketplace.

22       Now there are these jobbers that go around, and actually

23   it's the salons and the distributors that sell off the back of

24   the truck or out of the back of the store to these collectors who

25   go around and collect these products, sell them to other

distributors who package them up, sell them to Walmart.

L'Oréal has tried assiduously to stop this practice, and is still doing so, and the descriptions of our efforts are in the papers.  But what that means is that from the time it leaves L'Oréal's hands and out into the marketplace, there are a number of touches, and each time one of those distributors or jobbers or collectors touches it, they're looking for a profit margin.

So it's no surprise that by the time it gets to Walmart it's more expensive than it was in the salon, and that is a fundamental point of the diversion marketplace that most people don't understand.  They just assume anything that's in Walmart's going to be cheaper than what's in the salon.

I believe that was the assumption that underlay plaintiffs' claim at the outset of this case.  That's what we worked to disabuse them of, that's what all the factual record related to, and if in this case plaintiffs were actually interested in that, they would have asked for all this material, which to my knowledge they did not.

In terms of the mediation itself, we had a very reputable mediator from California.  We had an entire day's session, very hard-fought.  We then went on with post-mediation phone calls that were overseen by the mediator, usually with him acting as go-between.  We then came up with this settlement.  Only after that did we address fees.

Again, there was a mediation.  Again, we didn't reach

1    agreement.  It took awhile after that.  We then provided all this

2    discovery to plaintiffs to confirm every representation that we

3    had made during that settlement process.  There has been no

4    collusion here.

5         I'll wait to hear the objections, Your Honor, but unless you

6    have further questions, that's it.

7                    THE COURT:  Good morning.

8                    MR. SCHULMAN:  Good morning, Your Honor.

9                    THE COURT:  Do you dispute the claim that this is

10   basically a zero-damages case, that there is no monetary value,

11   either on an individual basis -- general individual basis.  There

12   may be an aberrant individual; everyone has said that that's at

13   least conceivable -- but either on a general individual basis or

14   collectively in terms of a class, that there is really no value

15   to damages claims?  That's the position that both the plaintiffs

16   and the defendants in this case say the record establishes.

17   Do you disagree with that?

18                    MR. SCHULMAN:  We do disagree.

19                    THE COURT:  On the basis of what?

20                    MR. SCHULMAN:  The settlement proves it because of the

21   fact that they're willing to put $956,000 up.  We think that's

22   the value of the claims.  It's not much per class member.  It

23   would be more if you took out the mass-retail purchasers.

24                    THE COURT:  Well, doesn't the defendant get some

25   value for this in terms of not having to deal with any future

1    claim?  Even though it would amount to zero, they still would

2    have to litigate it and defend it, and with not having to further

3    litigate this case, they're getting some value out of it.

4         MR. SCHULMAN:  I agree with that.  I agree with that

5    statement, yes.  Otherwise, it wouldn't be in the settlement if

6    they weren't getting any value.  There's some value for them.

7    But I was planning to talk preliminarily about a few other

8    matters that haven't come up today --

9         THE COURT:  But is your only argument that there is

10   some monetary value to individual or class damages claims that,

11   well, there has to be, otherwise there wouldn't be a settlement?

12   Is that your only argument, or do you dispute it on the facts?

13        MR. SCHULMAN:  I would dispute it on the facts.

14   We aren't privy to the information released to the plaintiff, so

15   we can't say for certain.

16        THE COURT:  But you're privy to the record before me.

17        MR. SCHULMAN:  I am privy to the record before you.

18        THE COURT:  Do you have anything you want to say with

19   respect to that record?  Because that's what I'm going to be

20   reviewing, have reviewed to a certain extent and I'm going to be

21   reviewing further, to decide whether there is any monetary value

22   to individual or class-wide damages claims.  So if you have

23   anything to say on that, you should say it.

24        MR. SCHULMAN:  I would point you to the settlement

25   provision of $956,000 in the other direction.  That's what the

1    Pampers court says.  That amount is real.  It's not illusionary.

2    It's almost perverse to say that because the claims are weaker

3    that the attorneys can take a larger percentage of the real value

4    there.  I mean, that incentivizes -- that's what the Pampers

5    court was concerned about.  You can read through the opinion.

6          THE COURT:  But there could conceivably, couldn't

7    there, in some context be an injunctive-only class action under

8    (b)(2)?

9          MR. SCHULMAN:  For past purchasers?

10         THE COURT:  Yes.

11         MR. SCHULMAN:  I would dispute that, because I think

12   past purchasers have to be in a (b)(3).  As a matter of law, they

13   have no interest in future -- I mean, the (b)(2) classes require

14   a degree of cohesiveness that isn't present when you have a class

15   of past purchasers, because certain of those purchasers aren't

16   going to purchase again.  They're not going to be interested in

17   the injunctive relief.

18       They made a big deal about how Ms. Holyoak had used Redken

19   several times, but since she switched salons in 2012, she hasn't

20   used it once and doesn't intend to use it in the future.  So if

21   she isn't benefitted by it, and there's certainly other people --

22   you need to establish an ongoing relationship.

23       We cite nearly a dozen cases where courts have refused

24   or reversed certifications of (b)(2) classes where there's no

25   ongoing relationship, and just alleging brand loyalty doesn't

1    overcome that objection.  They pushed that idea pretty hard in

2    Pampers where I was counsel of record for the objector, and the

3    6th Circuit referred to that as egocentrism, the idea that they

4    have an interest in the future labeling of products that they've

5    bought previously.

6        We made three main arguments, as I'm sure you can tell from

7    our papers: the (b)(2) argument, the (a)(4) intraclass conflict

8    argument, and the 23(e) fairness argument.

9        THE COURT:  What's the intraclass conflict?  If there's

10   no real monetary relief that's viable, what's the intraclass

11   conflict?

12       MR. SCHULMAN:  Well, there may be monetary relief

13   viable.  A lot of these statutes --

14       THE COURT:  You're defeating my hypothetical by

15   answering a different question.  If there is none, if I conclude

16   that there is none, what's the intraclass's conflict?

17       MR. SCHULMAN:  Well, I would still say there's an

18   intraclass conflict because one set has a colorable claim --

19   regardless of the damages, they have a colorable claim on the

20   elements of the claim, and one doesn't because --

21       THE COURT:  What are the two that you're referring to?

22       MR. SCHULMAN:  The mass-retail purchaser has no

23   colorable claim because there can't be a claim of deception.

24   There's no claim of deception -- you can't assume that it's more

25   than puffery if you're in a Super Kmart like one of the named

1  plaintiffs in purchasing --

2           THE COURT:  -- look to see if it's a salon-only product

3  and not allowed to purchase it.

4           MR. SCHULMAN:  They don't have an out-of-body

5  experience and believe they're in a salon when they're not.

6  So there's no colorable claim there.

7      I'd refer you to an opinion actually released last week

8  in the BP Deepwater Horizon settlement down in the 5th Circuit.

9  Judge Clement's opinion discusses the intraclass conflict

10  between when one segment of the class has a colorable claim and

11  the other segment doesn't, and the plaintiffs seemed to think

12  that we shouldn't be concerned about it because I think they

13  misconceived our argument as being concerned for the mass-retail

14  purchaser.  But the concern is obviously for the people with the

15  stronger claim, those who purchased in the salon.

16           THE COURT:  Why is their claim stronger?

17           MR. SCHULMAN:  Because --

18           THE COURT:  Because they would be fooled.

19           MR. SCHULMAN:  There's a chance of --

20           THE COURT:  It's not stronger because they have more

21  monetary --

22           MR. SCHULMAN:  Damages, exactly.  Exactly.

23  So the problem is that those claims might be diluted, the value

24  of those, if whereas it's a smaller class, it could get -- see,

25  if you excluded the mass-retail purchasers from the class, then

1    you could theoretically divvy up the 956,000.

2        I would refer you to -- there's a discussion, I think in

3    the Hubbard case, Judge Leon's case from this summer, about how

4    a claims process can be done for a hundred or two hundred

5    thousand dollars.  That's the figure that's announced in that

6    case specifically.  So we think it's not infeasible to distribute

7    the constructive common fund among the plaintiffs.  But what is

8    happening here is they're trying to take 100 percent of the --

9        THE COURT:  But if I conclude that the plaintiffs have

10   no monetary claims that are viable, it seems a little odd to set

11   this up and distribute.

12       MR. SCHULMAN:  Well, I would say that's looking

13   a little too far behind the veil.  That issue isn't being

14   determined.  In the settlement, there's no admission of

15   liability; there's no claim that there's *no* liability.  That's

16   not a provision of the settlement.

17       So what you see on the settlement's face is there's $956,000

18   available, and it's all going to named plaintiffs and class

19   counsel.  That's not a fair settlement.

20       THE COURT:  So I guess your argument is there's no

21   vehicle, there's no class action that could be brought that would

22   recover injunctive relief only, future injunctive relief only,

23   for a class of past purchasers.

24       MR. SCHULMAN:  Not under --

25       THE COURT:  If they don't have a monetary claim,

1    either on a collective or an individual basis, then Rule 23's not

2    available to them?  They can't pursue a class action and succeed

3    in getting that future injunctive relief?

4          MR. SCHULMAN:  If you can't do it as a (b)(3) is the

5    premise of your question?

6          THE COURT:  Well, if there's no monetary relief,

7    if there are no damages, they can't --

8          MR. SCHULMAN:  -- might not be predominant.

9          THE COURT:  Right?

10         MR. SCHULMAN:  Yes.

11         THE COURT:  So the answer is --

12         MR. SCHULMAN:  But that is not admitted by the --

13         THE COURT:  -- they're out of luck.  There's no Rule 23

14   vehicle for that group of past purchasers if they didn't suffer

15   real monetary losses in connection with the purchases.

16         MR. SCHULMAN:  As long as they do not have an ongoing

17   relationship.  If they do, you can put it in a (b)(2).

18         THE COURT:  That's more a civil rights type situation.

19         MR. SCHULMAN:  Well, there could be a situation where

20   there's a class of subscribers to something and you have a

21   currently ongoing relationship with the defendant.  You know,

22   there's a continuing --

23         THE COURT:  You can have subscribers.  I can see that.

24         MR. SCHULMAN:  Continuing consumer relationship.

25         THE COURT:  But for past purchasers --

1          MR. SCHULMAN:  Of a discrete product.

2          THE COURT:  -- where it's a consumer individual

3    product, Rule 23 is simply not available.

4          MR. SCHULMAN:  If you cannot do a (b)(3), that would be

5    our position, yes.  And I don't think that's too controversial.

6          THE COURT:  Now, are you aware of any case --

7          MR. SCHULMAN:  I'm not, Your Honor.

8          THE COURT:  -- where there is a (b)(2) past-purchaser

9    no monetary relief -- well, it has to be --

10         MR. SCHULMAN:  I'm not aware.  I would have said

11   Pampers, but that was overturned recently.  That was the only

12   other case I was aware of.  We made the same arguments there,

13   and I think if they had reached that issue, rather than just

14   deciding it on fairness, the 6th Circuit would have said that a

15   (b)(2) certification wasn't appropriate in that case.

16         THE COURT:  I don't speculate on what you think.

17     (Laughter)

18         MR. SCHULMAN:  Okay.

19         THE COURT:  That's not authority I'm going to rely on,

20   your speculation of what the 6th Circuit would have done.

21     (Laughter)

22         MR. SCHULMAN:  Okay.  But I did want to talk about

23   how on the fairness issue they attempted to distinguish Pampers

24   and why those attempts are unsuccessful.  The plaintiffs referred

25   to, I believe, four reasons why Pampers was a different case.

The first reason they referred to is that the plaintiffs in
Pampers initially sought (b)(1) and (b)(3) certification and
monetary damages, whereas the Richardson complaint here now only
seeks injunctive relief.  But as Your Honor referred to before,
of course when the case was being litigated in Northern District
of California, the Ligon case, they did in fact seek monetary
damages.

More importantly, what the complaint seeks doesn't determine
the objective value to absent class members.  Pampers and
Bluetooth require an objective proportionality between the class
recovery and class counsel's recovery, and fairness dictates that
fees must be commensurate with class relief.  So that was our
first point.

The second point was that the injunctive relief in Pampers
was less than the injunctive relief here, but actually it's the
contrary.  It was more robust than the injunctive relief here.
The Pampers settlement allowed class members a chance to obtain
a money-back guarantee that at least had the theoretic possibility
of actually compensating past purchasers.

Moreover, that settlement provided for a $400,000 cy pres
donation to medical health programs, and even though the
6th Circuit was entirely correct that such relief was nearly
worthless to the class, the relief here only amounts to a
fraction of that nearly worthless relief.  It's the labeling
changes without the informational relief, without the money-back

1   guarantee relief, and without the cy-pres relief.

2       The third distinction they make is the fees here are 950,000

3   rather than 2.7 million.  But if you look at <u>Bluetooth</u>, the fees

4   there were less than 900,000.

5       THE COURT:  Let me ask you a question, if I may

6   interrupt you.

7       MR. SCHULMAN:  Sure.

8       THE COURT:  Are you suggesting that the Court should

9   restructure this with respect to the $950,000 and, as

10  restructured, approve the settlement?

11      MR. SCHULMAN:  I don't think the law permits you to

12  do that.  I think you have to read the rejector accepted it.

13  There's a 1986 Supreme Court case that's --

14      THE COURT:  Let me rephrase my question.  Are you

15  suggesting that if they agreed to that restructuring, then the

16  Court should approve it?

17      MR. SCHULMAN:  Could approve it?  If you resolve the

18  23(b)(2), if they did it as a (b)(3) --

19      THE COURT:  I'm sorry?

20      MR. SCHULMAN:  If they --

21      THE COURT:  So you also say it has to be done as a

22  (b)(3).

23      MR. SCHULMAN:  Exactly.  Exactly.  To allow the

24  possibility of an opt-out, because we think the monetary claims

25  from the perspective of the class, perspective of the claims, and

from the --

THE COURT:  I know you think there are, but you haven't convinced me that there are based on what's in the record other than to say, ah, $956,000?  There *must* be some value to those monetary claims.

MR. SCHULMAN:  Well, I think you can tell that a (b)(2)'s improper from the definition of the class, from the claims they're bringing on unjust enrichment and implied warranty of merchantability.  Those are monetary claims.

THE COURT:  They're monetary claims.

MR. SCHULMAN:  Exactly.  That's why it has to be a (b)(3) settlement.  It cannot be a (b)(2) settlement.

But to go back to the distinguishment of Pampers, which I think is a key issue because I think Pampers is directly on point in this case, they said that the fees here were 957 and 2.7.  In Bluetooth they were under 900,000, and that couldn't justify an unfair settlement.  And again, in Bluetooth they obtained beyond labeling relief.  They attained also a $100,000 cy-pres payment in addition to that.  You know, that's minuscule, but it's still more than what there is here.

And finally, and this might even be the most important, the plaintiffs indicate that they're unsure of whether the agreement on fees in Pampers was reached at the same time as the agreement on class relief, and there's no assertion -- there doesn't need to be an assertion of actual collusion like the defendants were

1   saying.  The defendant's indifference is enough on its own to

2   yield the unfairness in this settlement.  There's no requirement

3   of alleging actual collusion, and Pampers stands for that

4   proposition.

5       Again, as the lead attorney for the objector in Pampers, I

6   can tell you with certainty that class counsel in Pampers touted

7   not only that fees were finalized after the settlement in terms

8   in that case, but the fee recommendation was actually originated

9   on a "take it or leave it" basis by a respected mediator, also a

10  former federal judge.  Here it wasn't originated, so the

11  negotiations are, to the extent that it matters, less hard-fought

12  than in Pampers.

13      But I think the key line of Pampers is that you can --

14  Pampers concluded that the hard-fought negotiation only extends

15  the amount in which the defendant will pay, not in the manner in

16  which that amount is allocated between the class representatives,

17  class counsel, and unnamed class members.  That's the key

18  takeaway from Pampers.

19      As far as the mediator goes, Bluetooth also held that

20  the declaration of a respected mediator was not determinative,

21  and the Community Bank of Northern Virginia case -- that was in

22  the 3rd Circuit -- is also important for the separation of fees

23  and class relief, and says that it only matters if the fee

24  negotiation occurs actually after the judicial approval of the

25  settlement.  And I think that's correct as well.

1      So I could go on further on fairness.  I have a lot more,

2  but I don't know what you're interested in hearing about.

3          THE COURT:  You've got five more minutes to tell me

4  what's important.  You don't have to use it all.

5          MR. SCHULMAN:  Okay.  I'll continue on fairness, then.

6  The plaintiffs present a false dichotomy between choosing to

7  dismiss the case and choosing to settle for injunctive relief.

8  They should treat it as a $950,000 constructive common -- if they

9  structured it as a claims-made settlement, and they could --

10  which I think they can.

11      They can go to a settlement administrator and say, we only

12  have 956,000.  We need this administration done for one or two

13  hundred thousand dollars.  And then if they do that, these

14  claims-made settlements only yield very low claims rates, under

15  1 percent.  There's not going to be -- the pot of money will not

16  be overextended by just a normal claims-made process.  So it is

17  feasible to do that here.

18          THE COURT:  It has to be done in a (b)(3) context,

19  you believe.

20          MR. SCHULMAN:  Yes, exactly.

21          THE COURT:  Or structure.

22          MR. SCHULMAN:  Yes.  And the reversion of excess fees,

23  the provision that segregates that, it doesn't become okay merely

24  because the parties didn't structure a proper outlet  for excess

25  fees to revert.  Interestingly, that is the exact same argument

1    that the plaintiffs in <u>Bluetooth</u> made, that we have no other

2    outlet  for our excess fees to revert to, because there was no

3    cash fund for the plaintiffs there either.  But, obviously, the

4    9th Circuit held that it wasn't unacceptable in that case.

5          Then there's this notion that the lodestar justifies.

6    I heard a little bit of the plaintiffs talking about how they're

7    only attempting to recover their lodestar.  I'd refer you to --

8    I don't think I cited it in this objection, but there's this

9    good case out of District of Nevada, <u>Sobel v. Hertz</u>, where the

10   judge talks about how seeking your lodestar is where you get

11   very little relief for the class, is asking the class to settle

12   where the attorneys are unwilling to settle themselves, and how

13   it's inappropriate to award lodestar in that situation.

14         Now, that was its choice between percentage of the fund

15   method and lodestar method.  We would support any kind of

16   percentage of the fund because it best aligns the interest of

17   class counsel with the class, and the D.C. Circuit adopted that.

18         In fact, when we were before Your -- when my boss Ted Frank

19   was before Your Honor two years ago in <u>National Bank Settlement</u>,

20   which you approved and we did not appeal because we thought your

21   opinion was fair and just in that case, you refused to use the

22   lodestar even as a cross-check and instead awarded pure 25 percent

23   of the common fund, and we think that's an appropriate method to

24   use.

25         I was planning to talk about some preliminary matters, but

1    they haven't come up.  So I don't know if you --

2            THE COURT:  I'll rely on the papers.

3            MR. SCHULMAN:  On the papers for like the standing

4    argument.  Okay, good.  What else did I want to say.

5        Oh.  There hasn't been much talk about the (a)(4) problem

6    today, but I do think that that's somewhat of a severe issue,

7    actually.  Under the jurisprudence of the Supreme Court and the

8    D.C. Circuit, we cited the Ortiz case and the Melong case from

9    1980 in the D.C. Circuit for the claim that you can't include,

10   within the same class claims of widely divergent value, colorable

11   and noncolorable claims.

12           THE COURT:  What's the wide divergence here?

13           MR. SCHULMAN:  The mass-retail purchaser versus the

14   salon purchaser, in terms of the elements of their --

15           THE COURT:  The wide divergence in value based on the

16   record before me is what?

17           MR. SCHULMAN:  There's a wide divergence in

18   meritoriousness of the claim.  One is at least a colorable claim.

19           THE COURT:  Salon owners.

20           MR. SCHULMAN:  Exactly.  Exactly.  And the

21   intraclass conflicts are not limited to situations where some

22   class members are benefitted by the same conduct that harmed

23   those.  That's only one instantiation of an intraclass conflict

24   that was mentioned by Dewey.  In fact, Dewey found an intraclass

25   conflict in a different situation where the class relief -- one

subclass was shut out of the relief unfairly, and this is yet
another situation where the claims of divergent strength are
intermixed.

It's not an answer to the problem to say, well, look,
the settlement relief obtained benefits for all class members,
because as Dewey holds, following Ortiz, where the class fails on
a structural level, it must be vacated without regard to whether
the actual outcomes were affected.

The (b)(2) issue is very significant, but I think I said
a lot about it in the papers.  One thing I did want to say was,
it sounded from their reply papers and it still sounds today
like the plaintiffs are working backwards.  They started from
the idea we can only get injunctive relief, but they should be
starting from the idea, How is the class defined?  What are the
classes claimed?  What do we need to get?  And they didn't do
that.

THE COURT:  Where would that have taken them?
Play that out.

MR. SCHULMAN:  Well, there's a number of possibilities.
One is that they would agree to divvy up the constructive common
fund appropriately.  I mean, there's a lot of different avenues
it could have gone as a (b)(3) settlement.  We're not intending
to dictate which avenue occurs after you reject this settlement
and certification of (b)(2), but there's a number of different
outlets.  They could go back to the bargaining table, find an

1    equitable way -- it doesn't have to be a claims-made settlement

2    to divide the $1 million the defendant has offered.

3        Even if they can't find a settlement administrator willing

4    to do the administration for a feasible percentage of the

5    available money, the plaintiffs should continue to try to

6    litigate on the certification in the entire case if necessary,

7    and if they feel that the discrepancies on damages actually

8    prevent certification under the Comcast decision which they

9    asserted in the brief, they've sort of asserted today as well,

10   then the class is in fact better off having the case dismissed

11   because the certification requirements of 23(a) and (b) serve to

12   protect absent class members from being roped into classes

13   where their interests are not adequately protected or where

14   there's not proper predominance commonality.

15        THE COURT:  So what do you see happening if I decline

16   to approve this settlement?

17        MR. SCHULMAN:  I think the most feasible way is they

18   would be able to go to a settlement administrator and say this is

19   the only amount of money that we have to offer you.  What can you

20   do that -- you know, there's tens of settlement administrators

21   out there.

22        THE COURT:  And they'll have to recast the case as

23   a (b)(3) --

24        MR. SCHULMAN:  As a (b)(3) settlement.

25        THE COURT:  -- class with opt-outs.

1          MR. SCHULMAN:  Yes.  They'll have to file another

2   complaint, probably look like the leading complaint, the actual

3   contentiously litigated complaint, rather than what I call it,

4   the Potemkin village complaint that they have here.  Then they'll

5   equitably divide the fund and claims-made settlement.  You see

6   that all the time.

7          If Your Honor wants, I could do further briefing as far as

8   examples of cases where claims rates are sub 1 percent and allow

9   with a smaller pot of money, a $7 million pot of money, the

10  division among class members.  Obviously, they'd have to rectify,

11  in our opinion, the (a)(4) problem as well, which might be they

12  could certify a subclass with separate representation to do that.

13         THE COURT:  So they did all that.

14         MR. SCHULMAN:  Yeah.

15         THE COURT:  So they did all that.

16         MR. SCHULMAN:  Yeah.

17         THE COURT:  You think the fund would stay at $956,000?

18         MR. SCHULMAN:  Rather than -- why would the fund drop?

19  The defendant valued that at --

20         THE COURT:  Well, let's not only think of it dropping.

21  The attorneys are going to spend a lot more time to do that, but

22  you think it should still stay at $956,000.

23         MR. SCHULMAN:  Well, I mean --

24         THE COURT:  I mean, not only is the $956,000, if --

25  let's assume for a moment that it does accurately represent the

1    lodestar.  Just assume that for a moment.  If they spent a

2    thousand hours before, they're going to spend another thousand

3    hours.

4            MR. SCHULMAN:  Well, there's a couple of things to say

5    there.  Actually, the fund may increase, and it may increase

6    because theoretically, under that type of (b)(3) settlement, the

7    release for the defendants could be broader.  It could be

8    individual claims as well, and that would be legitimate under a

9    (b)(3) settlement so that they could add more money for that.

10           THE COURT:  Maybe they're willing to pay for that.

11   Do you think they really fear an individual claim?  I mean, this

12   theoretical individual claim that we've all put forward do you

13   think really exists?

14           MR. SCHULMAN:  You know, the individual claims can be

15   statutory damages in some states.  I don't know what the maximum

16   that is, maybe up to a thousand dollars in some states, but, you

17   know -- I think that they would pay a premium for the broader

18   release.

19           THE COURT:  That would be an individual claim.

20   It would actually be a different cause of action than the cause

21   of action in the class action.

22           MR. SCHULMAN:  Oh, rather than the -- oh, yeah.  Rather

23   than the unjust enrichment or merchantability, yes.  There would

24   be those individual...

25           THE COURT:  So you think that they can get a release

1  of individual claims of other causes of action?

2          MR. SCHULMAN:  Of those causes of action.  Without

3  having a state-by-state representative system, you mean?  Well,

4  that would be a difficult issue.  I don't want to commit to

5  saying they could get that.

6          THE COURT:  I don't think you should.

7      (Laughter)

8          MR. SCHULMAN:  But I do think that that could augment

9  the fund even more.  You know, the fact that they only might get

10  50 percent of their lodestar if they spent the same amount of

11  hours restructuring, I don't think that that --

12          THE COURT:  They'll get less than 50 percent, because

13  the 956,000 is going to be divvied up on other things, and then

14  they're going to spend more time.

15          MR. SCHULMAN:  Right.  So they're going to be down to,

16  you know, 15 percent.  But that doesn't mean that the settlement

17  -- I mean, settlements get rejected even where they're only

18  asking for 30 percent of the lodestar all the time, you know.

19          THE COURT:  I realize that.  I'm just trying to get

20  some reaction.  There's a little bit of practicality that has to

21  be played out here.

22          MR. SCHULMAN:  No, I understand it wouldn't be the

23  optimal result for the plaintiffs' attorneys.  But I think that

24  they would, you know, chalk it up as a relative loss, but they

25  would get something.  It wouldn't be as if they're completely

1    uncompensated, and that's what they should do.  If a class has

2    to settle, they have to settle.  It's completely fair.

3            THE COURT:  Indeed, why shouldn't it be a loss if what

4    they first started off believing they had was a damages claim?

5            MR. SCHULMAN:  Right, exactly.  Exactly.  That's what

6    equity would demand, you know?  So I think that's exactly the

7    correct way to look at it.

8        Do you have anything else you wanted me to address?

9            THE COURT:  Thank you.

10           MS. WOLCHANSKY:  What Mr. Schulman talked about pretty

11   much the entire time was this idea of a constructive common fund,

12   and if I'm right, I just heard him say that individual claims for

13   consumers that could potentially -- I don't know of any state

14   that has a thousand-dollar statutory penalty, but he just

15   represented that there may be a state that has a thousand dollars

16   for an individual claim.

17       So Mr. Schulman is suggesting that we get the individual

18   claims that could be worth up to a thousand dollars released to

19   give the class members 10 cents.  We're talking about the

20   practicality of this --

21           THE COURT:  He did suggest that initially.  I think

22   he's backed off that a little bit.

23           MS. WOLCHANSKY:  I mean, the practicality of divvying

24   up this money, the $950,000 to the class members -- and L'Oréal

25   can stand up and they can back me up on this with the sales

1   numbers.  We're talking about $500,000 to class members that are

2   in the tens of millions.  Even if we talk about a 1 or 2 percent

3   take rate of the total sales, we are talking about pennies to

4   consumers.

5       Mr. Schulman represents we can get a notice administrator.

6   Forget the notice administrator.  If I put the stamps on the

7   envelopes, it's going to cost more to send a check than it would

8   the money to the consumer.  If we're talking about the value of a

9   stamp and the pennies we're talking about giving to the consumers

10  that they aren't entitled to anyway, it's not equitable.

11          THE COURT:  I do see a problem with this.

12          MS. WOLCHANSKY:  He relies very heavily on the Pampers

13  case, and I think it's very important to realize that the Pampers

14  case -- and I don't know how familiar Your Honor is with that

15  case, but the Pampers case was a case where they originally --

16  and not just originally, but I believe throughout the mediation

17  and into the final approval stages -- attempted to certify a

18  class under a (b)(3).

19      That was a case where the plaintiffs had alleged that the

20  diapers were causing pussy, painful diaper rashes.  This was a

21  product-defect case.  And the injunctive relief, while

22  Mr. Schulman wants to stand here now and tell you that it was

23  great for the class, it didn't do anything.  They didn't remove a

24  label.  They essentially put some marketing material on the box

25  telling people, well, you should try another diaper.  And they

instituted a rebate program that already covered half of the
class.  I mean, I don't need to belabor it.  We briefed it.

    But this is not the Pampers case.  It would be convenient
if it was, since they were lead counsel in that case, but the
court, importantly, as Your Honor pointed out, did not find that
the (b)(2) class was not appropriate.

    What they found was that the $2.7 million worth of attorneys'
fees was not proportionate to the injunctive relief to the class.
They didn't -- the Court did not come to the conclusion that the
(b)(2) was inappropriate.  So I'm not going -- I would love to,
you know, in the opposite think that hypothetically the court
would have found it was okay, but I'm not going to do that, and
it hasn't been reached.

    Here you've talked about this intraclass conflict, and
Mr. Schulman admitted that the salon purchasers don't have any
more monetary damage than the retail purchasers, because both of
them don't have any.  So by including the retail purchasers, who
were reasonably deceived as were the salon purchasers --

        THE COURT:  Any class conflict with respect to the
injunctive relief?

        MS. WOLCHANSKY:  No.  We don't believe there is any
intraclass conflict, and to the extent -- I'm sorry.  I'm not
sure that I'm understanding.

        THE COURT:  Is there a difference between salon
purchasers and mass-retail purchasers with respect to how much

1   of a benefit they get from the injunctive relief?  Seems to me

2   that there is.  Right?

3           MS. WOLCHANSKY:  Not necessarily.  I don't think so.

4           THE COURT:  The only reason that it doesn't amount to

5   much in terms of an intraclass conflict is, "So what?"  We're

6   just talking about injunctive relief, and they're not getting

7   that and giving up something else, because there is, in your

8   view, basically a zero value to anything else.

9           MS. WOLCHANSKY:  The retail purchasers are benefitting

10  by the settlement, by the removal of the deception.  There are

11  undoubtedly consumers like Ms. Ligon who went out, bought it in

12  the retail store and didn't necessarily understand why a salon

13  product was available in the mass market, purchased it thinking

14  that it was a salon product, which we now know has no monetary

15  value to it, and was reasonably deceived.

16      So those purchasers are benefitting from the settlement, but

17  it's not hurting, it's not -- there is no more claim available

18  for the salon purchasers than there is for the retail.  There is

19  no conflict, because nobody's being harmed by this.

20          THE COURT:  All right.  Last point.

21          MS. WOLCHANSKY:  Last point is just that the lodestar

22  is appropriate here.  Some Nevada case that I don't even have a

23  cite to is not controlling in this district.

24          THE COURT:  Why shouldn't I, when I'm thinking of this

25  and thinking about what is reasonable, be thinking of the fact

1    that this case was originally conceived of as a damages action

2    but it winds up as something much less?  Even though there may be

3    value to the injunctive relief, it's much less than it was

4    originally conceived of and initiated as.

5         Why shouldn't I be thinking of this in terms of, geez, why

6    should the attorneys get full dollar on their investment of time?

7    Why is that a fair and reasonable result in terms of a case where

8    the attorneys *admit* that this transformed into something much

9    different, and I would say much less, than what they started out

10   with?

11        MS. WOLCHANSKY:  When we pursued this case on a

12   contingent basis with the idea that we would get the best

13   settlement that we could for the class, we recognized that

14   getting money to the class was not feasible.  So we have achieved

15   the best settlement practicable here.  We have completely

16   eradicated --

17        THE COURT:  All that says is, if you shoot for the moon

18   and think that you're going to get the moon, even if you get a

19   little piece of rock, it's okay because that's the best you could

20   get.

21        MS. WOLCHANSKY:  The standard is we have achieved the

22   best settlement here practicable for the class, and we have put

23   time in.  In order to get a settlement for the class, as

24   Mr. Warder would stand up here and tell you, we could have

25   gotten --

1          THE COURT:  I'll have to look at the case law pretty

2   closely because I'm not sure that the case law really supports

3   the proposition that if class counsel bring a case that they

4   really believe is a billion-dollar case, and they invest in it

5   and pursue it on that basis, but it winds up, through discovery

6   and close examination, to only be a $10,000 case, that they

7   should nonetheless get the $5 million in attorneys' fees that

8   they invested in the case because they originally thought it was

9   a billion-dollar case.

10      I don't think the law necessarily supports that conclusion.

11  To the extent that that is a transferrable hypothetical to this

12  case, I need to look at it closely.

13          MS. WOLCHANSKY:  And we don't have a valuation of

14  the injunctive relief here to tell you that the injunctive relief

15  is worth $37 billion and we're only asking for a small fraction.

16  We don't have a concrete number to give you to value the

17  injunctive relief.

18      But for representing to Your Honor -- and the record will

19  speak for itself -- that diversion is a big issue in the

20  industry, and we believe that we have effected major change in

21  the industry.  By removing the deceptive labels, that goes beyond

22  the label but really into the view of the products in the

23  marketplace without the salon-only and kind of the cachet that

24  attaches to that by removing the salon-only language.

25      So while I can't represent here to Your Honor that I think

it has a specific monetary value, that is very valuable to the

class, and we think that that justifies the time that we have put

in.  We did not take time litigating a case for monetary damages

for five years and then realize, oh, well, there aren't monetary

damages; we're going to settle it.

THE COURT:  I'm not saying the hypothetical that

I posed is an appropriate model for this.

MS. WOLCHANSKY:  Right, right, right.  But here we have

the time that we've actually put in to bring this settlement,

this injunctive relief settlement, here before Your Honor for

final approval, the documents that we needed to review, the

mediation, the negotiation, all of that.

So it's not time that we spent pursuing a different case to

now try to get paid for in this case.  This is time that we've

spent on this case, this settlement.  That's why we think it's

reasonable.

THE COURT:  All right.  Thank you.

MS. WOLCHANSKY:  Thank you.

THE COURT:  Last point.

MR. WARDER:  Thank you, Your Honor.  Just to cover two

quick things.  The first is that Your Honor's questions have

primarily focused on the value to the class of the class-wide

monetary claims, but it is important to us that you also have the

authority to consider and should consider whether or not this

class would be certified if it were to proceed.

1            THE COURT:  To proceed as what, a (b)(3) class or a

2      (b)(2) class?

3            MR. WARDER:  Either one.  Either one.  Because of the

4      problems with ascertainability, with materiality and reliance and

5      causation and with proof of damages, since we think there are

6      none, but even if there were, how would you prove that across a

7      nation where the prices differ all over the place?  The fact that

8      it is extremely unlikely that this class would ever be certified

9      we believe is an important part of the Court's consideration of

10     the propriety of the settlement.

11            THE COURT:  Because I should view it as it's better for

12     the plaintiffs to wind up getting something --

13            MR. WARDER:  Something.  That they otherwise would not

14     get at all.  That's right, Your Honor, because if we proceed and

15     get this class beat, then the plaintiffs get nothing.

16         The second thing is the question of whether there is value

17     to past purchasers.  Objector's counsel talked about the theory

18     of the ongoing relationship and the possibility of a

19     subscriber-like relationship.  Something unique about this case

20     that plaintiffs' counsel has put into evidence before Your Honor

21     is that many consumers do have an ongoing relationship.

22         In fact, the objector's own client had an ongoing

23     relationship that appeared to have nothing to do with the label.

24     She bought these products while she was with a particular salon,

25     moved salons, presumably got a different recommendation, and

1    started buying another set of products.  She didn't stop buying

2    these products because of the claim.  She's now going to move

3    salons again and again.

4        All that time she has an either actual or potential ongoing

5    relationship with these products and with that labeling.  So the

6    fact of the frequency of repeat purchases in this marketplace

7    does mean that there is an ongoing relationship, and it's a

8    fairly unique circumstance.

9            THE COURT:  There are some ongoing relationships, and

10   there are some not.  As you say, people move salons; they change

11   products.

12           MR. WARDER:  That's absolutely right.

13           THE COURT:  And in the mass-retail market, I'm not

14   sure there's an ongoing relationship that you can point to.

15           MR. WARDER:  I would never suggest that there is an

16   ongoing relationship with all class members, but to the extent

17   there are an appreciable number of class members who have an

18   ongoing relationship, they directly benefit from the injunctive

19   relief in this case.  Thank you, Your Honor.

20           THE COURT:  Thank you very much.

21           MR. SCHULMAN:  May I make two short points in rebuttal,

22   one for her --

23           THE COURT:  Very short.

24           MR. SCHULMAN:  Very short.  Extremely short.  The point

25   to her is there's been a lot of talk about the importance --

 1          THE COURT:  And don't talk too fast because it's not

 2   fair to the court reporter.

 3          MR. SCHULMAN:  Sorry.  There's been a lot of talk today

 4   about how there's no monetary harm to the class and how that

 5   would justify the settlement.  Well, I want to say that's exactly

 6   what happened in Pampers, too.  She comes up talking about how

 7   there was pus and boils allegations in Pampers.

 8      Well, the claims were totally undercut from them during the

 9   proceedings.  Health Canada and the Consumer Product Safety

10   Commission -- I think the 6th Circuit might talk about this

11   somewhere in the procedural history of the opinion, but they

12   found that there was no issue at all, and that's exactly what

13   happened here.  That can't justify an unfair settlement where

14   class counsel's taking a disproportion.

15      And the point in response to L'Oréal was that you should

16   consider that if there was a certification motion, it would be

17   difficult to proceed.  In fact, the standard is "undiluted."

18   The only difference is manageability concerns.  Amchem says

19   specifically that courts must apply an undiluted, even heightened

20   standard, at settlement.  So that shouldn't be a concern at all.

21          THE COURT: All right.  Thank you all.  I'm going to

22   have to chew on this a little bit.  I'm not prepared to give a

23   decision, even tell you what the decision is going to be.  I've

24   got to look at some things a little closer, and so you will hear

25   from me in the relatively near future.  I'm not asking for any

1    additional briefing.  I don't think I need any additional

2    briefing.  Thank you all very much.

3                    (Proceedings adjourned at 10:50 a.m.)

```
1                    *   *   *   *   *   *

2                       CERTIFICATE

3          I, BRYAN A. WAYNE, Official Court Reporter, certify

4    that the foregoing pages are a correct transcript from the record

5    of proceedings in the above-entitled matter.

6                        _____
                         BRYAN A. WAYNE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```