**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALEXIS RICHARDSON, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 13-508 (JDB)** |
| **L'OREAL USA, INC.,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Before the Court is [17] plaintiffs' motion for conditional class certification for the purposes of settlement and motion for final approval of the class settlement. On June 27, 2013, this Court entered an Order preliminarily approving the settlement and preliminarily certifying the settlement class. [ECF No. 14]. Pursuant to that Order, the parties disseminated notice to the settlement class. Declaration of Compliance With Class Notice Procedures [ECF No. 15]. Several class members, including Melissa Holyoak, filed objections to the settlement under Federal Rule of Civil Procedure 23(e)(5), and plaintiffs filed a reply in opposition to those objections. [ECF Nos. 19, 21, 23]. The fairness hearing was held on October 11, 2013, at which time the Court heard argument from the parties and from one of the objectors. For the reasons explained below, the Court concludes that final certification of the class and final approval of the settlement are not warranted.

**BACKGROUND**

This case is about purportedly misleading labels on several L'Oréal hair product brands. Namely, L'Oréal described some of its products as "salon-only" when in fact the products were also sold in mass-market retail stores. Plaintiffs filed this action on April 15, 2013, alleging that

defendant L'Oréal falsely and deceptively labeled its Matrix Biolage, Redken, Kérastase, and Pureology products as available only in salons when the products can be purchased in non-salon retail establishments including Target, Kmart, and Walgreens. See Compl. [ECF No. 1] ¶¶ 1, 29. Plaintiffs allege that the salon-only label implies a superior quality product and builds a cachet that allows L'Oréal to demand a premium price. See id. ¶ 27. L'Oréal claims that the products are sold outside of salons without its permission. Plaintiffs acknowledge that L'Oréal has developed a campaign to fight the diversion—i.e., the sale of salon-only products through stores that do not have a salon—for each of the product lines at issue in this litigation. See id. ¶¶ 30-37. But plaintiffs allege that, despite L'Oréal's efforts, the products are available in non-salon establishments, and they argue that L'Oréal's labeling and advertising for these products is hence deceptive and misleading. See id. ¶ 46. This case was originally filed last year in the Northern District of California, at which point it related only to one product and one plaintiff. See Ligon v. L'Oréal USA, Inc., No. 12-4585 (N.D. Cal. Aug. 30, 2012). After five plaintiffs were added, the plaintiffs voluntarily dismissed that action and refiled here in April on behalf of all six representative plaintiffs and with respect to more products. Plaintiffs originally sought damages, but upon refiling they seek only an injunction.

## TERMS OF THE SETTLEMENT

Soon after filing this case, the parties filed a motion for preliminary approval of their proposed settlement, which this Court granted. [ECF No. 14]. The nationwide settlement class includes all consumer purchasers from August 30, 2008 to June 27, 2013,[1] and excludes retail

---

[1]     After preliminary approval and notice, the parties stipulated to an amendment of the class definition, in an apparent response to an objection. [ECF No. 22]. Previously, the class was open-ended: it was defined as all those who purchased the products after August 30, 2008. This new end date, June 27, 2013, is the date that the Court preliminarily approved the settlement.

purchasers, stylists, and the usual interested parties.[2] The only relief for class members provided in the settlement agreement is injunctive: L'Oréal agrees to remove the offending terms from the labels of certain brands, for a minimum period of five years.[3] After five years, L'Oréal can resume using the terms on products for which mass-market sales (in other words, non-salon sales) have been reduced by 60%. If the settlement is approved, the injunction gives L'Oréal some time to remove the offending terms to allow for manufacturing to catch up.

The release contained in the settlement agreement would release L'Oréal from all class actions arising out of the conduct at issue, including damages class actions, but it would not release L'Oréal with respect to individual actions arising out of the conduct at issue.[4] As part of the settlement, L'Oréal agreed not to object to an award of attorney's fees of up to $950,000— including fees, costs, and expenses—which is the amount requested by plaintiffs' counsel.[5] The settlement agreement also provides for incentive awards of $1,000 to each class representative.[6] The parties disseminated notice in the form approved in the Court's preliminary approval order:

---

[2]     The class is defined as: "[a]ll consumers nationwide who purchased the L'Oréal Products for personal, family or household use from August 30, 2008, up to and including June 27, 2013. The Settlement Class excludes: (i) purchasers of the L'Oréal Products for re-sale, stylists and salon owners; (ii) L'Oréal, its officers, directors and employees; and its affiliates and affiliates' officers, directors and employees; (iii) Plaintiffs' Counsel and their employees; and (iv) judicial officers and their immediate family members and associated court staff assigned to the D.C. Action." Stipulation [ECF No. 22].

[3]     From the settlement agreement: "The settlement provides for injunctive relief only. L'Oréal will remove the contested claims from U.S. advertising and from labeling on products for U.S. distribution, except for certain products also sold or distributed in European countries using the same packaging; L'Oréal will not use the claims for at least five years, and, after five years, it may resume using the claims in markets with a 60% reduction from 2012 levels of non-salon sales; L'Oréal will cease manufacturing labels for U.S. products that carry the claims and will remove the claims from websites and promotion materials shortly after the agreement becomes effective, but it will not destroy products or product packaging in its inventory." Settlement Agreement [ECF No. 9-2] ¶ 2.4.

[4]     Id. ¶ 4.6.

[5]     "Attorneys' Fees: L'Oréal will not oppose an application by plaintiffs' counsel for attorneys' fees, costs, and expenses up to $950,000. The Agreement provides that the award of fees is separate from settlement; if the Court approves only a lower fee award, the remainder of the settlement will remain binding." Id. ¶ 2.6.

[6]     "Treatment of Class Representatives: Class representatives will petition for an incentive award of no more than $1000 each." Id. ¶ 2.5.

L'Oréal published a notice in USA Today for four days and made a website available for a month.[7]

## OBJECTIONS

Class counsel identified three objections that had been received as of October 2, 2013. One of those objections was timely filed with the Court—Melissa Holyoak's objection—and it was comprehensive enough that it covered the substance of the potentially meritorious objections by the other two objectors.[8] Melissa Holyoak ("CCAF"), a class member,[9] is represented by her colleague at the Center for Class Action Fairness, Adam Schulman. Mr. Schulman appeared at the fairness hearing to object to plaintiffs' standing to seek injunctive relief, conditional class certification, the fairness of the settlement, the requested amount and distribution of attorney's fees, and the amount of the incentive award requested for each of the class representatives. See generally Objection of Melissa Holyoak [ECF No. 19] ("Objections"). Ms. Holyoak's objections are addressed in further detail in the Court's discussion of whether final class certification and settlement approval is warranted.

## STANDARD OF REVIEW

A class can be certified for "settlement purposes only" and such practice has become increasingly common. See Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 50 (D.D.C. 2010) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997)). Class actions seeking class certification and settlement at the same time, however, require "closer judicial scrutiny" than settlements that are reached after class certification. Manual for Complex Litigation, Fourth,

---

[7]    [ECF No. 14]; Settlement Agreement [ECF No. 9-2] ¶¶ 3.2, 3.5.

[8]    The Court permitted the late filing of Gabi Canales Morgan's objection. [ECF No. 21]. Her two-page list of objections covered much of the same ground as Melissa Holyoak's filing, albeit in less detail. Although the Court will not separately address Ms. Morgan's objections, the substance will be addressed through analysis of Ms. Holyoak's objections. Joseph Lee Jones also objected to the settlement, claiming entitlement to $200,000. Reply at 3. But he did not make any particular objection to the settlement, and he did not timely file his objection with the Court. Id. Thus, his objection will not be considered.

[9]    Plaintiffs do not dispute Ms. Holyoak's standing to object.

§ 21.612 (2004). Class actions that settle early in the case "sometimes make meaningful judicial review more difficult and more important." Id.; see also Amchem, 521 U.S. at 620 (observing that "settlement-only class certification" requires "undiluted, even heightened" attention that is "of vital importance"); D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (calling for "a higher degree of scrutiny in assessing [the] fairness" of settlements negotiated prior to class certification and the need to examine the "negotiating process leading up to the settlement as well as the settlement's substantive terms"). Manageability of the action at trial is the only variable removed from the class certification equation when assessing certification for settlement purposes; plaintiffs bear the burden of showing that all other requirements of Rule 23 are satisfied. Amchem Prods., 521 U.S. at 620.

A proposed class action settlement requires the Court's approval. Fed. R. Civ. P. 23(e). The Court has the discretion to approve or reject the proposed settlement. In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 375 (D.D.C. 2002). When deciding whether to grant approval, the Court must strike a balance between a rubber-stamp approval and "the detailed and thorough investigation that it would undertake if it were actually trying the case." Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 565 F. Supp. 2d 49, 54 (D.D.C. 2008) (internal citation omitted). Although the Court should undertake careful scrutiny of the settlement terms, the discretion to reject a settlement is "restrained by the 'principle of preference' that encourages settlements." In re Lorazepam, 205 F.R.D. at 375 (quoting Pigford v. Glickman, 185 F.R.D. 82, 103 (D.D.C. 1999)); see also United States v. District of Columbia, 933 F. Supp. 42, 47 (D.D.C. 1996) ("The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and

appropriate under the particular facts and that there has been valid consent by the concerned parties.") (internal quotations omitted).

## DISCUSSION

CCAF's objections fall into three broad categories: CCAF argues that plaintiffs do not have standing under Article III to seek injunctive relief, that the class cannot be certified under Rule 23(b)(2), and that the settlement is not fair, reasonable, or adequate. The Court will address each argument in turn.

## I.    PLAINTIFFS HAVE STANDING TO OBTAIN INJUNCTIVE RELIEF

CCAF's objection that the named plaintiffs do not possess Article III standing to seek injunctive relief must be addressed first. Objections [ECF No. 19] 12. Standing is a "threshold question in every federal case." Warth v. Seldin, 422 U.S. 490, 498 (1975). To have Article III standing, a plaintiff must establish: that "[she has] suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; that "there [is] a causal connection between the injury and the conduct complained of"; and that "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). A plaintiff must also establish standing for each form of relief sought. Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). When seeking prospective relief, such as an injunction, a plaintiff's standing "depend[s] on whether he [is] likely to suffer future injury" from the challenged conduct. City of L.A. v. Lyons, 461 U.S. 95, 102, 105 (1983) ("injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical'"). Moreover, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v.

Littleton, 414 U.S. 488, 495-96 (1974); see Summers, 555 U.S. at 493 ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact'"); Tucker v. Phyfer, 819 F.2d 1030, 1034-35 (11th Cir. 1987) (noting, in rejecting class certification under Rule 23(b)(2), that "a plaintiff who has standing to bring a damages claim does not automatically have standing to litigate a claim for injunctive relief arising out of the same set of operative facts"). In the class action context, standing depends on the representative plaintiffs: at least one must be able to show that she is likely to suffer future injury because of the defendant's conduct. McNair v. Synapse Grp., Inc., 672 F.3d 213, 223 (3d Cir. 2012). In other words, plaintiffs here cannot establish standing by relying on the likelihood of future injury to absent class members. Id.; O'Shea, 414 U.S. at 495-96.

CCAF raises two reasons that plaintiffs do not have standing to seek injunctive relief here. Those arguments both relate to a purported failure by the named plaintiffs to establish that they are likely to suffer future injury. For several reasons, though, the Court finds that plaintiffs have established the required likelihood of a particularized future injury.

CCAF first argues that plaintiffs have not sufficiently alleged that they are likely to purchase the products at issue in the future. Instead, emphasizing the language in the complaint ("Plaintiffs were decieve**d** and misle**d** . . . and therefore suffere**d** injury"), CCAF urges that plaintiffs have alleged only that they have suffered discrete harm in the past. Objections [ECF No. 19] 13. In similar cases involving past purchasers seeking injunctive relief, courts have differed on the showing plaintiffs must make to have standing. For example, courts have reached different conclusions about whether plaintiffs who disclaim any intent to purchase the product at issue in the future have standing. Compare Delarosa v. Boiron, Inc., No. 10-1569, 2012 WL 8716658, at *5 (C.D. Cal. Dec. 28, 2012) (no threat of future injury because plaintiff would not

purchase ineffective homeopathic product again); Bohn v. Boiron, Inc., No. 11-8704, 2013 WL 3975126, at *4 (N.D. Ill. Aug. 1, 2013) (same); Wang v. OCZ Tech. Grp., Inc., 276 F.R.D. 618 (N.D. Cal. 2011) (no threat of future injury because plaintiff already purchased electronics and did not allege he would purchase again); Robinson v. Hornell Brewing Co., No. 11-2183, 2012 WL 1232188, at *4 (D.N.J. Apr. 11, 2012) (no threat of future injury because plaintiff stated intent never to purchase product again); with Larsen v. Trader Joe's Co., No. 11-5188, 2012 WL 5458396, at *4 (N.D. Cal. June 14, 2012) (plaintiffs had standing even though they would not purchase the products again); Henderson v. Gruma Corp., No. 10-4173, 2011 WL 1362188, at *7-8 (C.D. Cal. Apr. 11, 2011) (plaintiffs had standing even though they likely would not purchase the products again). Where plaintiffs affirmatively state that they intend to purchase the products in the future, courts have found standing to seek injunctive relief. See, e.g., Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 533-34 (N.D. Cal. 2012) ("[T]he record is devoid of any grounds to discount plaintiffs' stated intent to purchase in the future, thereby satisfying the requisites for standing."). In this context, an ongoing subscriber relationship is the clearest analogue to the prototypical (b)(2) class seeking injunctive relief for employment discrimination. See McNair, 672 F.3d at 223-27. But a subscriber relationship is not the only way for plaintiffs to demonstrate that they have standing. After all, plaintiffs' standing depends on whether they are "likely to suffer future injury," and allegations that plaintiffs intend to purchase the products in the future may establish that likelihood. Lyons, 461 U.S. at 105 (emphasis added). Such allegations provide concrete indications that plaintiffs are likely to be harmed in the future, rising above mere speculation about possible future purchases. See Lujan, 504 U.S. at 563-64 (no standing for plaintiff with no current plans to return to site of alleged injury).

Here, plaintiffs have not indicated that they do <u>not</u> intend to purchase the products in the future. Cases where plaintiffs make such statements usually involve products that do not work as advertised—for example, certain homeopathic products, <u>Delarosa</u>, 2012 WL 8716658 at *5; <u>Bohn</u>, 2013 WL 3975126 at *4—or plaintiffs who affirmatively proclaim their resolve never to purchase the product again, <u>Robinson</u>, 2012 WL 1232188 at *4.[10] By contrast, this case involves representations not about the product's performance, but about its pedigree. <u>See</u> Tr. of Fairness Hr'g [ECF No. 25] 8 (arguing that this is not a case where "[plaintiffs have] been duped and [they are] not going to buy this again. That's not what we have here."). As a result, the named plaintiffs may have good reasons, unrelated to the salon-only labels, for not swearing off L'Oréal products. In any event, the Court need not resolve whether disclaiming any intent to purchase L'Oréal products in the future defeats standing, because plaintiffs here have not done so.

But CCAF insists that plaintiffs have not sufficiently alleged that they <u>will</u> purchase the products in the future—that the injunctive relief "at most benefits future purchasers of L'Oréal products." Objections [ECF No. 19] 10. Because the class is defined as past purchasers, argues CCAF, a fatal discontinuity stands between the relief sought and those who will benefit. <u>Id.</u> True, plaintiffs frame much of their complaint in the past tense, starting with the definition of the class: those who "purchased" L'Oréal's products between August 30, 2008 and June 27, 2013. Settlement Agreement [ECF No. 9-2] ¶ 2.4. And most of the named plaintiffs identify

---

[10]    The chief argument that such plaintiffs can have standing appears to be solicitude for the public policy expressed by state consumer fraud statutes. <u>See, e.g.</u>, <u>Henderson</u>, 2011 WL 1362188 at *7-8. As other courts in the Ninth Circuit have noted, however, standing is a jurisdictional requirement demanded by Article III, which plainly trumps the will of a state legislature that consumers have injunctive remedies in federal court for false or misleading representations. <u>See</u> <u>Mason v. Nature's Innovation, Inc.</u>, No. 12-3019, 2013 WL 1969957, at *5 (S.D. Cal. May 13, 2013). And as at least one court has pointed out, consumers may be able to meet lower thresholds for standing in certain state courts, such as in California. <u>Bohn</u>, 2013 WL 3975126 at *4. Thus, finding that plaintiffs who will never purchase the product in the future do not have standing to obtain injunctive relief would not thwart consumer fraud statutes. <u>See id.</u> at *4 n.4 ("[Plaintiff] is not without recourse. If she wishes to prevent an allegedly deceptively advertised product from remaining on the shelves, she can notify a number of state and federal regulatory agencies and ask for them to take action."). And plaintiffs are not automatically entitled to a federal forum. <u>See, e.g.</u>, <u>Lee v. Am. Nat'l Ins. Co.</u>, 260 F.3d 997, 1001-02 (9th Cir. 2001) ("[A] plaintiff whose cause of action is perfectly viable in state court under state law may nonetheless be foreclosed from litigating the same cause of action in federal court.").

themselves as having "purchased" the products at some point in the past. Compl. [ECF No. 1] ¶ 9 ("Ms. Ligon purchased [the products] . . . on June 19, 2012, and . . . on April 19, 2012"); id. ¶ 10 ("Ms. Richardson purchased [the products] . . . in or about 2012"), id. ¶ 11 ("Ms. Bertrand purchased [the products] . . . in or about 2011"), id. ¶ 12 ("Mr. Sandler purchased [the products] . . . multiple times in 2012"), id. ¶ 14 ("Ms. Krengel purchased [the products] . . . in or about 2012"). As is often the case in complaints, factual allegations mainly appear in the past tense. See, e.g., id. ¶ 15 ("[w]hen Plaintiffs purchased"; "they reasonably relied"; "they understood,"; "Plaintiffs paid a premium price"; "Plaintiffs were deceived and misled . . . and therefore suffered injury"); id. ¶ 56 ("Plaintiffs and all Class members have suffered injury"; "Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs, like all Class members, purchased [the products] believing . . .").

The allegations relating to one of the named plaintiffs, however, can fairly be read to mean that she continues to purchase the products. Id. ¶ 13 ("Ms. Peshimam has been purchasing [the products] . . . for the past nine years"; and "[i]n 2012, she began purchasing [other L'Oréal products at issue]."). Plaintiffs also include other allegations of continuing and future harm based on the "salon-only" representations. Id. ¶ 58 ("Plaintiffs and Class members would be left with no effective remedy for the damages they suffered and continue to suffer."); id. ¶ 73 ("The above-described unlawful business acts and practices of Defendant present a threat and reasonable likelihood of continued deception to Plaintiff Ligon and other members of [the class] . . ."); id. ¶ 93 ("Defendant's acts were and are likely to deceive reasonable consumers . . ."); id. ¶ 110 ("If Defendant is not restrained from engaging in these types of practices in the future, Plaintiff Ligon and other members of the [class] will continue to suffer harm."). In addition to the allegations of continuing purchases and future injury in the complaint, plaintiffs have

consistently represented the risk of future harm during litigation. <u>See</u> Tr. of Fairness Hr'g [ECF No. 25] 9 (distinguishing cases involving ineffective homeopathic remedies "because [those purchasers are] not going to buy [the products] again" and that "[t]his is a case where purchasers are buying these products"); <u>id.</u> 12 (arguing that "[w]e have past purchasers who have . . . a likelihood of buying [the products] again and then a likelihood of being deceived again if [the offending labels are] not removed"); Plaintiffs' Reply [ECF No. 23] ("Reply") 14 (arguing that if the Court orders the injunction, "Ms. Peshiman and the other Plaintiffs will be able to purchase L'Oréal products again without [reservations about the allegedly false labeling]"). Plaintiffs also filed a declaration from a salon owner that purchasers of hair products, such as those at issue here, frequently exhibit strong brand loyalty, bolstering the likelihood of future injury. Decl. of Andrea Kuhn [ECF No. 23-6] ¶ 7. And at least four of the named plaintiffs—as well as the objector herself—are repeat purchasers of some of the products, consistent with the evidence of brand loyalty. Compl. ¶¶ 9, 12, 13; Kuhn Decl. 2. Moreover, the record is devoid of evidence suggesting that plaintiffs are not likely to purchase the products again and thus not likely to suffer future harm. <u>See</u> <u>Ries</u>, 287 F.R.D. at 533.

CCAF argues next that, because the named plaintiffs necessarily know of L'Oréal's alleged deception through their involvement in this case, the named plaintiffs cannot possibly suffer future injury. <u>See</u> Objections [ECF No. 19] 13 (named plaintiffs "are now aware, and were aware at the time the suit was filed, that the L'Oréal products are not exclusively sold in high-end salons"). Put differently, CCAF maintains that the named plaintiffs are not at risk of being fooled by the "salon-only" labels into purchasing L'Oréal's products, and that this precludes a finding of standing for injunctive relief. <u>Id.</u> CCAF finds some support for this position. <u>See, e.g.</u>, <u>McNair</u>, 672 F.3d at 225 (rejecting argument that plaintiffs had standing because they might be

tricked by deceptive offer in future); <u>Stoneback v. ArtsQuest</u>, No. 12-3287, 2013 WL 3090714, at *12 (E.D. Pa. June 20, 2013) (no standing because "plaintiffs now know the origin" of the deceptively labeled products); <u>Cattie v. Wal-Mart Stores, Inc.</u>, 504 F. Supp. 2d 939, 951 (S.D. Cal. 2007) (noting that it is "unclear how prospective relief will redress [plaintiff's] injury, since she is now fully aware" of the truth behind the advertisement). Plaintiffs counter that if, upon uncovering deception in advertising, a consumer could not get a court order enjoining the deception precisely because she had already uncovered the deception, no plaintiff could ever have standing to seek injunctive relief for deceptive marketing. Reply 14.

At first, the power of this syllogism seems undeniable. But this Court declines to conclude—as some other courts have—that public policy requires plaintiffs to have standing here, notwithstanding the requirements of Article III. Instead, the Court concludes that plaintiffs have standing despite their knowledge of the "salon-only" misrepresentation because of the likelihood of future harm. In some cases, knowing about the deceptive nature of marketing will stop consumers from purchasing the deceptively marketed products. This is particularly true where the misrepresentation relates to the effectiveness of the product: once someone knows that a flu remedy is a placebo, they are not likely to be fooled into purchasing it again. But this is not such a case. <u>See</u> <u>Mason v. Nature's Innovation, Inc.</u>, No. 12-3019, 2013 WL 1969957 (S.D. Cal. May 13, 2013) ("In these types of cases that do not involve claims that a product does not work or perform as advertised, injunctive relief may still be available."). Here, the misrepresentation relates to the exclusivity of the product; it is a representation that the product is so high-end that it can only be purchased in certain locations. Once the veil is lifted on that misrepresentation, however, a consumer might rationally continue to purchase the product for any number of reasons—cost, effectiveness, convenience, brand loyalty, and so on. That is even more likely

where, as here, consumers may not be paying a premium for the misrepresentation. <u>See</u> <u>infra</u> Part II.

To the extent the named plaintiffs purchased the products strictly because of the "salon-only" misrepresentations, the risk of future harm may not be identical to that suffered in the past. It is unlikely that the named plaintiffs will purchase the products again because they believe that they are only sold in salons. But they will be harmed—without an injunction—by not being able to rely on the "salon-only" label with any confidence. <u>Ries</u>, 287 F.R.D. at 533 ("[Inability to rely on label's representation] is the harm California's consumer protection statutes are designed to redress."). Put another way, the named plaintiffs will have no way of knowing whether L'Oréal's ongoing "diversion awareness" campaign is having any effect in deterring mass-market sales and boosting the label's veracity. And given the diversity of products L'Oréal offers, the Court does not need to assume that named plaintiffs will remember the list of products for which the labels are deceptive. Hence, the Court finds that even the named plaintiffs, knowledgeable about the misrepresentations, are likely to suffer future harm in the absence of an injunction.

On this record, then, the Court finds that plaintiffs have established the requisite likelihood of future harm. Two practical considerations support this result. First, plaintiffs could not have defined the class to include future purchasers. <u>See, e.g.</u>, <u>Saur v. Snappy Apple Farms, Inc.</u>, 203 F.R.D. 281, 285-86 (W.D. Mich. 2001); <u>Mueller v. CBS, Inc.</u>, 200 F.R.D. 227, 236 (W.D. Pa. 2001). Indeed, when they at first left open the class definition to include future purchasers, CCAF objected, prompting plaintiffs to close the class by amending it to exclude those who purchased the products after June 27, 2013. Objections [ECF No. 19] 22-24; Stipulation [ECF No. 22]. Rather than permitting classes defined to include future purchasers, courts require that plaintiffs demonstrate that they will probably benefit from the requested

future relief. See Lyons, 461 U.S. at 105. For example, former employees in employment discrimination cases cannot benefit from an injunction prohibiting future discrimination by the employer. See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2559-60 (2011). But there is no certainty that current employees in those cases will not quit tomorrow, and hence courts require only that plaintiffs show that future injury is likely, for which current employment is enough. See id. Similarly here, repeat past purchases, brand loyalty, allegations of ongoing purchases, and an injury unconnected to the performance of the product combine to show that future injury is likely. Second, although it is possible to conclude that plaintiffs should have alleged more clearly their intent to continue purchasing the products, requiring them to amend their complaint to strengthen those allegations would waste the resources of the parties and of this Court. Because on this record the Court is able to infer that the named plaintiffs intend to purchase the products in the future, it is unnecessary to reject the proposed settlement simply to order that plaintiffs fortify the indications of that intent. Accordingly, the Court concludes that plaintiffs have standing to seek injunctive relief.

## II.      THE PROPOSED CLASS DOES NOT SATISFY RULE 23

To certify a class for settlement, a court must consider whether the proposed class meets the requirements of Federal Civil Rule 23. For the reasons discussed below, the Court concludes that final class certification is inappropriate.

### A.      The Proposed Class Meets The Rule 23(a) Requirements

The proponent for class certification has the burden of establishing that each of the prerequisite elements of Rule 23(a) are satisfied: (1) the class is so numerous that joinder of all members is impractical ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) claims/defenses of representative parties are typical of the claims

common to the class ("typicality") and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). All of these requirements are satisfied here.

### 1.    Numerosity

Rule 23(a)(1) only requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In this district, courts have found that numerosity is satisfied when a proposed class has at least forty members—a point not contested by any party here. See Vista Healthplan v. Warner Holdings Co. III Ltd., 246 F.R.D. 349, 357 (D.D.C. 2007) (citing Bynum v. District of Columbia, 214 F.R.D. 27, 32 (D.D.C. 2003)). It is undisputed that L'Oréal has sold the products at issue to thousands of members of the putative settlement class. Hence, the numerosity requirement is met. See Bynum, 214 F.R.D. at 32-33.

### 2.    Commonality

Questions of law and fact must be common to the class under Rule 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." Wal-Mart, 131 S. Ct. at 2551 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)). The "claims must depend on a common contention . . . [which] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the class claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. And "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. In this case, commonality is satisfied because the claims are based on the common contention that

L'Oréal has sold each class member one or more products with false or misleading "salon-only" labels. The class therefore satisfies the "commonality" requirement.

### 3.    Typicality

Rule 23(a)(3) requires a finding that the representative parties' claims or defenses "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The requirement for "typicality" is satisfied "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 192–93 (D.D.C. 2011). The facts and claims of each class member do not have to be identical. See Daskalea v. Wash. Humane Soc'y, 275 F.R.D. 346, 358 (D.D.C. 2011). Instead, courts have found the "typicality" requirement satisfied when class representatives "suffered injuries in the same general fashion as absent class members." See In re Vitamins Antitrust Litig., 209 F.R.D. 251, 260 (D.D.C. 2002) (internal quotations omitted). Here, typicality is satisfied because the claims of named plaintiffs and of absent class members are based on the same core set of facts and underlying legal theories: whether the "salon-only" labels on the products purchased by members of the class were false or misleading.

### 4.    Adequacy

Under Rule 23(a)(4), the class representative must fairly and adequately protect the interests of the class. Two criteria are generally recognized for determining the adequacy of class representation—(1) the interests of the named representative must not be antagonistic to or compete with the interests of the unnamed class members; and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel. Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997) (internal quotations and

citations omitted); <u>Vista Healthplan</u>, 246 F.R.D. at 358. The Court finds that, while the class representatives may have some conflicting interests due to the incentive awards, those conflicts are not so great here as to defeat a finding of adequacy. <u>See</u> <u>In re Lorazepam</u>, 205 F.R.D. at 375 (approving substantial incentive awards without expressing any adequacy concerns). And because among the class representatives are both mass-market purchasers and salon purchasers, the intra-class conflict discussed below does not render the representatives inadequate. Nothing indicates that counsel are not qualified or experienced. Hence, the Court finds that the proposed class meets all of the requirements under Rule 23(a).

### B.      The Proposed Class Does Not Meet The Rule 23(b)(2) Requirements

The bulk of CCAF's objections focus on whether certification of the settlement class is proper under Rule 23(b)(2). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." <u>Amchem</u>, 521 U.S. at 614. CCAF offers several arguments why this action is not. Certification of a (b)(2) class is proper where the Rule 23(a) requirements are satisfied and if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Again, this burden is no lighter in the context of a settlement-only class certification, though the Court need not worry about manageability of the action at trial. <u>Amchem</u>, 521 U.S. at 620. And it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks omitted).

1.      **The release of class-wide damages claims is improper under Rule 23(b)(2).**

Rule 23(b)(2) is unlike Rule 23(b)(3) in that it is "mandatory": absent class members do not have the right to opt out of the class and they are not entitled to the best notice practicable. In Phillips Petroleum v. Shutts, 472 U.S. 797 (1985), the Supreme Court held that absent class members have a due process right to opt out of class actions seeking predominantly monetary damages, such as those certified under Rule 23(b)(3). Id. at 811-12. The Court left open the question whether due process compelled opt-out in actions not seeking predominantly monetary damages. Id. And in Wal-Mart Stores Inc. v. Dukes, 131 S. Ct. 2541 (2011), the Court held that claims for monetary relief may not be certified under (b)(2) where the monetary relief sought is not incidental to the injunctive or declaratory relief. Id. at 2557 (Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages"). The Court again declined to reach the question whether (b)(2) allows class certification of any monetary claims, but it held that "at a minimum, claims for individualized relief (like the backpay at issue [in Wal-Mart]) do not satisfy the Rule." Id. That is because "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Id. Thus, "individualized monetary claims belong in Rule 23(b)(3)." Id. at 2558; Richards v. Delta Air Lines, Inc., 453 F.3d 525, 530 (D.C. Cir. 2006) ("If recovery of damages is at the heart of the complaint, individual class members must have a chance to opt out of the class and go at it alone—or not at all—without being bound by the class judgment."). When a class seeks "an individual injunction benefitting all its members at once," the procedural protections afforded by (b)(3) are unnecessary. Wal-Mart, 131 S. Ct. at 2558. The defendant will be enjoined whether or not any

particular class member opts out. But to bind absent class members as to their individualized monetary damages claims, courts must provide more notice and the right to opt out.

CCAF's primary concern with the settlement here is the release. The release preserves the individual claims of class members for damages relating to the "salon-only" labels. Settlement Agreement [ECF No. 9-2] ¶ 2.4. But it purports to release L'Oréal from liability for all class-wide damages claims. Id. In other words, upon settlement, class members can bring individual claims for damages based on the "salon-only" labels, but cannot maintain a Rule 23(b)(3) class action or any other type of class action seeking damages. As a result, CCAF argues that the parties are trying—improperly—to certify damages claims under Rule 23(b)(2).

Analysis of CCAF's argument requires a more detailed understanding of the facts here. To begin with, plaintiffs do not seek any damages in their complaint. It is true that, as CCAF points out, plaintiffs' original complaint sought damages. See Ligon v. L'Oréal USA, Inc., No. 12-4585 (N.D. Cal. Aug. 30, 2012). But once the plaintiffs made an assessment that recovering damages on a class-wide basis was not possible, Reply [ECF No. 23] 12, they refiled their suit, dropping the damages claims. In addition, the settlement does not release individualized claims for damages. In a normal (b)(3) damages class action settlement, plaintiffs release not only class-wide damages claims but individual damages claims too: the defendant often seeks "global peace." Here, there is a release for class-wide damages claims, but not individual damages claims. The explanation is simple, at least from the defendant's perspective: the possible recovery on an individual damages claim is too small for any rational consumer to file a case. The claims here relate to consumer purchases for relatively low dollar amounts, and compensatory damages would likely be similarly low. Yet the aggregation procedure provided by Rule 23 is critical in cases that involve relatively trivial individual damages. Giving up the

class-wide damages claims effectively releases L'Oréal from all monetary liability for the "salon-only" labels.

Under <u>Shutts</u>, this Court cannot bind absent class members "concerning claims wholly or predominantly for money damages" without providing the notice and opt-out of Rule 23(b)(3). 472 U.S. at 811 n.3. In <u>Wal-Mart</u>, the Supreme Court expressed doubts about whether even monetary claims that do not predominate could be certified in the absence of notice and opt-out. If this Court certifies the settlement class and enters judgment approving the settlement, the release of class-wide damages claims would bind absent class members. The question, then, is whether that judgment concerns claims for money damages that are more than "incidental." Damages claims are incidental when class members would "automatically . . . be entitled [to damages] once liability to the class (or subclass) as a whole is established." <u>Allison v. Citgo Petroleum Corp.</u>, 151 F.3d 402, 415 (5th Cir. 1998). In contrast, damages predominate when the damages that class members could recover would be "dependent . . . on the intangible, subjective differences of each class member's circumstances" and would "entail complex individualized determinations." <u>Id.</u>

Plaintiffs argue that because they do not seek any damages in this complaint, the Court would not be binding absent class members concerning even incidental damages claims. But <u>Shutts</u> is, at bottom, about the preclusive effect of a judgment. It does not comport with due process to bind a plaintiff who is not before a court, and who is perhaps even unaware of a judgment, as to money damages claims, without notifying her of the suit and giving her the chance to opt out. 472 U.S. at 811-12. Otherwise, that plaintiff might be surprised to learn that someone else has bargained away her damages claim without her knowing about it or having any say in it. For example, perhaps the plaintiff's individual claim is far more valuable than the

compensation she would receive if she stayed in the class. Thus, the focus here is not, as plaintiffs contend, whether plaintiffs seek any damages. Rather, it is whether the judgment will bind absent class members as to their damages claims. And here, omitting damages claims from the complaint but agreeing to release damages claims on a class-wide basis is tantamount to asserting damages claims but agreeing to compromise the ability to bring them as a class in return for nothing. Either way, absent class members will be precluded from bringing a class action for damages in the future, all without knowing about it or without being given the chance to opt out.

The plaintiffs in Wal-Mart attempted a similar strategy. There, plaintiffs left compensatory damages out of the complaint and argued that certification under (b)(2) was proper because the backpay claims did not "predominate" over the injunctive relief sought. 131 S. Ct. at 2559. The Court rejected that argument, noting that it would "create perverse incentives for class representatives to place at risk potentially valid claims for monetary relief." Id. The possibility that compensatory claims might be precluded "underscore[d] the need for plaintiffs with individual monetary claims to decide for themselves whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have." Id. Just as here, the Wal-Mart plaintiffs argued that because they did not assert compensatory damages claims, those claims should not affect the (b)(2) calculus. As the Supreme Court explained, though, the possibility of preclusion is the pertinent concern, and even the claims left out are therefore relevant to the (b)(2) analysis.

Preserving individual damages claims here does not help plaintiffs. "[M]ost of the plaintiffs would have no realistic day in court if a class action were not available." Shutts, 472 U.S. at 809. In consumer actions such as this, damages are typically far too low for a rational

plaintiff to pursue an individual action, greatly increasing the value of the aggregation procedure in Rule 23. See id. The class-action claim is essentially the only way absent class members could ever recover any damages here. See id.; Felix, 290 F.R.D. at 408 (rejecting argument that exception in release for trivial individual claims cures fairness problem as to release of class-wide damages). As a result, while it is true that absent class members retain the legal right to bring individual claims, plaintiffs have bargained away the only practical means of asserting those claims. It is not necessary here to determine whether permitting plaintiffs to settle a class-action damages claim, while leaving individual damages claims intact, can ever be proper under Rule 23(b)(2). On this record, the Court is simply unable to determine that certifying the class and approving the settlement would bind absent class members as to what are only incidental damages claims.

For one thing, any damages that plaintiffs might recover on a class-wide basis, were damages claims to be asserted, would not be incidental in this case that is focused on alleged overcharging. See Kottaras v. Whole Foods Mkt., Inc., 281 F.R.D. 16, 27 (D.D.C. 2012) ("It is clear that money damages are at the heart of this case. The injury alleged is a financial loss due to overcharges resulting from the [mislabeling]. This is economic harm."). Plaintiffs do not now seek damages, but it is necessary to consider what plaintiffs seek to bargain away in practice. Class members would not "automatically . . . be entitled [to damages] once liability to the class (or subclass) as a whole is established." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998). Instead, any damages that class members could recover would be "dependent . . . on the intangible, subjective differences of each class member's circumstances" and would "entail complex individualized determinations." Id. Unlike, for example, entitlement to a statutorily mandated damage award on a finding of liability, class members here would have to

establish several different elements to show their entitlement to damages. See Tr. of Fairness Hr'g [ECF No. 25] at 32. These types of individualized determinations indicate that, were plaintiffs to assert damages claims, they could not seek them in a (b)(2) class action because they would predominate over the injunctive relief. See Wal-Mart, 131 S. Ct. at 2258-59. Instead, they would be the proper subject of a (b)(3) damages class.

The parties counter that the Court should not be concerned about certifying the class because, in their view, there are no viable class-wide damages claims. In other words, absent class members would only be precluded from bringing a class action that would never be certified under (b)(3). Thus, the parties urge that where class damages claims are absolutely meaningless, see generally Tr. of Fairness Hr'g [ECF No. 25] at 24-28, releasing them without notice or opt-out cannot, as a matter of law, violate absent class members' due process rights. The parties cite no authority for this novel proposition. In the only two cases located by the Court involving similarly structured settlements, courts have rejected the settlements based on fairness grounds and have not reached the due process issue. See Crawford v. Equifax Payment Servs., 201 F.3d 877, 882 (7th Cir. 2000); Felix v. Northstar Location Servs., 290 F.R.D. 397, 408 (W.D.N.Y. 2013). And in effect, the parties are asking this Court to prejudge the merits of claims not before it; to conclude that those as-yet-unfiled claims are meritless; and hence to preclude those claims from ever being asserted, all without the putative claimants' participation. But assuming even that would be appropriate, this case is not the proper vehicle. For on the record before the Court, it is impossible to determine with any level of certainty that the class damages claims to be surrendered by class members are valueless.[11]

---

[11]   Valueless to potential claimants, that is. L'Oréal naturally places a high value on the release, and the Court does not dispute its value to L'Oréal.

At the outset, proving a universal negative—that there is no possibly viable class action for damages—is inherently problematic. See Vieth v. Jubelirer, 541 U.S. 267, 311 (2004) (Kennedy, J., concurring) ("[P]roving a negative is a challenge in any context."). More fundamentally, it is not the role of this Court to speculate as to whether a hypothetical class can be certified. And it would be even more troublesome to base a decision that strips procedural rights from absent class members, without their knowledge or consent, on that speculation. See Shutts, 472 U.S. at 811-12. This is not a case where the parties have briefed the issue of certification of a damages class and asked the Court to make a decision about whether certification is proper. Instead, the parties—in a non-adversarial litigating position—ask the Court to make a blanket determination that, based on a relatively thin record, (b)(3) certification could never be proper. Hypothesizing about every possible set of potential class members and engaging in the complex analysis of class certification, all without the aid of adversarial briefing, is not an appropriate task for the Court.

In any event, plaintiffs' argument about the impossibility of certification is not persuasive. Plaintiffs cite an intensive factual investigation and assessment to represent that, in their judgment as experienced counsel, no class action for damages could ever be maintained. Reply [ECF No. 23] 11 ("[C]ertification of a class seeking monetary relief was impossible. There were no classwide claims for monetary relief."). The Court does not question counsel's experience or motives, but once discussions focus around settlement, the incentives of the parties are aligned, and plaintiffs have less motivation to zealously advocate for certification of a (b)(3) class. As a result, the Court approaches the parties' representations with some caution. Plaintiffs aver that their investigation revealed the following: that L'Oréal did not charge a premium for the products based on the "salon-only" representation; that L'Oréal has never sought to

determine whether it was able to charge such a premium; that on average, class members paid slightly more for the products in mass-market retailers than in salons; and that prices charged by mass-market retailers varied tremendously both within and between geographic markets. Motion [ECF No. 23] 4-5. The conclusion that counsel draws from this investigation is that the variations in the prices, along with the determination that salon purchasers on average paid less than mass-market purchasers, rendered any (b)(3) action impossible to maintain. Motion [ECF No. 17] 5 ("Plaintiffs concluded that it would have been difficult to ascertain a principled formula for assessing the value of an individual consumer's monetary damages claim"); Reply [ECF No. 23] 5 ("[C]lasswide monetary relief claims have no value.").

An initial problem with plaintiffs' conclusions is a factual deficiency. Specifically, when plaintiffs determined that class members paid slightly more for the products when purchasing in mass-market retailers instead of salons, plaintiffs compared sample prices from mass-market retailers all over the country against a single data point: the manufacturer's suggested retail price ("MSRP"). Motion [ECF No. 17] 4. Plaintiffs have not compared what mass-market retailers charged with what salons actually charged; rather, they compared what mass-market retailers charged with how much L'Oréal suggested the salons should charge. L'Oréal represents that it has no statistical data whatsoever on the prices that salons charge. Decl. of Christopher Lyden [ECF No. 9-4] 4. It further represents that it believes that the MSRP is a good proxy—"at least for purposes of comparing prices charged by salons to prices charged by non-salon retailers." Id. But at bottom, plaintiffs represent that no class-wide damages claims exist based on a proxy for the actual price charged in salons that may or may not be reliable, without any corroboration that the proxy is remotely accurate. The Court simply cannot conclude on this record that there are no viable class-wide claims. If a sampling of salons revealed that, in fact, salons charge

considerably more than the MSRP, for example, there may indeed be class-wide damages. And there may be ways to define the class (or subclasses) with reference to particular geographic locales in which salon customers did pay a premium. Even if it is true that nationally consumers paid no premium on average, there may be pockets where they did.

It is not hard to imagine adventurous or avaricious counsel taking advantage of this novel settlement structure to the detriment of absent class members. For example, imagine a putative consumer class action where damages determinations would be relatively complex or speculative on a nationwide basis, but perhaps not so on a state-to-state basis. Calculating that a piece of a state-wide class would not be very rewarding to pursue, the hypothetical plaintiffs build a record showing that a broad nationwide class seeking damages could never be certified. Then, plaintiffs seek to file a suit for injunctive relief only and seek to settle with the defendant. Because releasing all damages claims in a (b)(2) settlement class would almost certainly be improper, the defendant agrees that plaintiffs need not release individual damages claims—the value of which is trivial, as in many consumer class actions. But plaintiffs agree to release class-wide damages claims, under the auspices of an impossible-to-certify nationwide class. Plaintiffs get attorney's fees, defendant gets a near-bulletproof release, and class members get . . . an injunction.

In the end, stripping the procedural right to bring a damages class action from absent class members without their knowledge or consent—and effectively precluding their damages claims—is not proper. Whether or not that procedural right is valuable is not for this Court to determine, and even if it were, the record here is far from conclusive that class-wide claims are meaningless. Otherwise, the Court would effectively be denying all hypothetical motions to certify a (b)(3) class (however framed) based on this conduct. Under Shutts and Wal-Mart,

before giving up monetary claims, absent class members are entitled to a level of due process that is missing here.

### 2.    The proposed class lacks cohesiveness

CCAF argues that, in addition to the problems related to certifying monetary damages claims in a (b)(2) class, the class lacks cohesiveness. "[A]ssumptions of homogeneity and class cohesiveness . . . underlie (b)(2) certification." Eubanks v. Billington, 110 F.3d 87, 94 (D.C. Cir. 1997); Blackman v. District of Columbia, 633 F.3d 1088, 1094 (D.C. Cir. 2011) ("[C]ohesiveness is a significant touchstone of a (b)(2) class."). The main issue affecting the cohesiveness of the proposed class here is an intra-class conflict: as CCAF points out, the interests of mass-market purchasers differ from the interests of salon purchasers. "[I]ntraclass equity" is a "requirement." Ortiz v. Fibreboard Corp., 527 U.S. 815, 862 (1999). Plaintiffs concede the heterogeneity of the mass-market purchasers, explaining at length how they may have paid more or less for the products than salon purchasers did, depending on geographic location and retailer.[12] Motion [ECF No. 17] 4-5. Indeed, whether mass-market purchasers were harmed at all is questionable, considering the self-evident nature of the "salon-only" misrepresentation when the products were purchased outside of salons. Although it is unclear on this record whether salon purchasers have valid claims, mass-market purchasers face a more difficult path to recovery. Accordingly, their interests diverge from the salon purchasers' interests. See Melong v. Micronesian Claims Comm'n, 643 F.2d 10, 13-14 (D.C. Cir. 1980) (certification of class with both strong and weak claims inappropriate). Salon-only purchasers have an interest in maximizing their possible damages recovery, while mass-market purchasers have an interest, if any at all, in getting an injunction. Most mass-market purchasers are likely to be uninterested in the result, because they probably could not obtain any money damages on

---

[12]    As explained above, plaintiffs make these comparisons using the MSRP.

these facts.[13] Hence, mass-market purchasers are not likely to mind a release of class-wide monetary claims. Salon-only purchasers, on the other hand, theoretically could be harmed by such a release. Intra-class conflicts such as this demonstrate that certifying the class under (b)(2) would be inappropriate because of the lack of cohesiveness of the class. Eubanks, 110 F.3d at 94. Intra-class conflicts are more problematic in the (b)(2) context because in the (b)(3) context class members with stronger claims can opt out. Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 338 (4th Cir. 1998). Where conflicts between class members with strong claims and those with weak claims arise, courts require either that the plaintiffs create subclasses represented by separate counsel or that those with weak claims be excised from the class.[14] Ortiz, 527 U.S. at 856. Plaintiffs have not done either here.

III.     **THE SETTLEMENT IS NOT FAIR, REASONABLE, AND ADEQUATE**

     To approve the settlement, the Court must find that it is "fair, reasonable, and adequate" under Rule 23(e)(2).  The burden of proving fairness is on the proponents of the settlement. In re Dry Max Pampers Litig., No. 11-4156, 2013 WL 3957060, at *4 (6th Cir. Aug. 2, 2013) (collecting cases). Some circuits hold that pre-certification settlement requires heightened scrutiny. See In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 946-47 (9th Cir. 2011) (citing cases from Second, Third, Seventh, and Ninth Circuits). "There is no single test for settlement approval in this jurisdiction; rather, courts have considered a variety of factors." In re

---

[13]     The Court does not opine on the propriety of releasing, on a class-wide basis, completely worthless damages claims without the due process described in Shutts.

[14]     Objectors also argue that because an adequate remedy at law exists—namely, monetary damages—and that the usual remedy for both unjust enrichment and breach of warranty (the only two claims asserted on behalf of the nationwide class) is monetary damages, plaintiffs are not entitled to injunctive relief. "The general rule is that injunctive relief will not issue when an adequate remedy at law exists." Richards, 453 F.3d 525, 531 n.6. Because the class cannot be certified, and thus the injunction will not issue, it is unnecessary to reach this argument.

LivingSocial Mktg. & Sales Practice Litig., No. 11-472, 2013 WL 1181489, at *23 (D.D.C. Mar. 22, 2013) (listing five factors).[15]

CCAF raises several reasons why the proposed settlement is not fair, reasonable, or adequate. To start with, objectors simply describe overall benefits of the settlement. Class members receive injunctive relief, and in return they surrender any class-wide claims for damages; meanwhile, plaintiffs' counsel receive almost a million dollars in attorney's fees and class representatives receive $1,000 each. See Crawford, 201 F.3d at 882 (rejecting similarly structured settlement as unfair). Viewing the settlement as a whole also reveals allocation problems: that is, the division of the settlement proceeds between the class, class representatives, and class counsel is not fair. Allocation problems often arise with class-action settlements because the defendant "will usually have no interest in how the fund is divided between the plaintiffs and class counsel"; the defendant is interested only in the bottom line. Hubbard v. Donahoe, No. 03-1062, 2013 WL 3943495, at *7 (D.D.C. July 31, 2013). Here, there is no apparent indication of collusion between plaintiffs' counsel and the defendant. Negotiations regarding the terms of the settlement and the fee award appear to have been properly segregated—though that does not necessarily cure any allocation problems. See In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mort. Litig., 418 F.3d 277, 308 (3d Cir. 2005). At least one circuit has cautioned that "when the class receives no monetary distribution but class counsel are amply rewarded," the settlement may be inequitable as between class counsel and the class. Bluetooth, 654 F.3d at 947.

---

[15] Because the Court reaches the conclusion that the settlement is fundamentally unfair, it is unnecessary to consider some of the other fairness factors often examined by courts, such as arm's length negotiations and the status of the litigation at the time of settlement. See, e.g., Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 194-200 (D.D.C. 2011).

Because the settlement creates no common fund to divide between class members and class counsel, determining attorney's fees by the lodestar method is likely appropriate.[16] Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1268 (D.C. Cir. 1993) (where no fund results, using a percentage-of-the-fund method to calculate attorney's fees "is not necessarily available") (citing Newberg, Attorney Fee Awards § 1.10, at 17 (1986)). Setting aside the issue of the proper amount to award in attorney's fees, the agreement on fees is itself a sign that the settlement may not be fair to the class. The settlement provides no monetary relief while rewarding counsel handsomely. Where counsel initially seek damages and end up obtaining injunctive relief only, rewarding counsel with a full 1.0 multiplier may be unfair. Sobel v. Hertz, No. 06-545, 2011 WL 2559565, at *14 (D. Nev. June 27, 2011). Plaintiffs go so far as to argue that counsel "obtained the precise relief they sought in the Complaint, and now ask to be reasonably compensated for achieving that benefit." Reply [ECF No. 23] 21. This is misleading. Counsel originally filed this case in California, seeking monetary damages. Upon realizing the difficulty—though perhaps not impossibility—of that goal, counsel refiled in order to settle for injunctive relief and a hefty fee award. "In other words, the class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright." Sobel, 2011 WL 2559565 at *14. Moreover, the result achieved here could be characterized as worse than "settling": counsel seeks to release class members' (originally asserted) class-wide damages claims for precisely nothing. Regardless of the implications for calculating attorney's fees, the amount requested by plaintiffs and agreed to by L'Oréal creates the impression of unfairness.

The incentive awards to class representatives buttress that impression of unfairness. "[T]he fact that one class member receives $2,000 and the other 200,000+ [class members

---

[16]     Although the lodestar method seems proper here, because the Court will deny the motion for certification and final approval, it need not decide the issue.

receive] nothing is quite enough to demonstrate that the terms should not [be] approved under Rule 23(e)." Crawford, 201 F.3d at 882. Plaintiffs are correct that "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." In re Lorazepam, 205 F.R.D. at 400 (internal quotation marks omitted). Indeed, about 30% of class actions include incentive awards. Theodore Eisenberg & Geoffrey Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 U.C.L.A. L. Rev. 1303, 1303 (2006). But here, the involvement of the representative plaintiffs does not justify such awards, particularly in light of the result obtained for all other plaintiffs. Cobell v. Salazar, 679 F.3d 909, 922-23 (D.C. Cir. 2012) (courts have discretion to approve incentive awards). The allegations on behalf of the representative plaintiffs are relatively sparse, consisting of allegations that they purchased the products at some point during the class period. See, e.g., Compl. [ECF No. 1] ¶¶ 9-15. This is not a case where the representative plaintiffs had to spend significant amounts of time helping counsel to prepare a detailed factual complaint; instead, the burden on the representative plaintiffs was relatively low. Set against the recovery obtained on behalf of the absent class members, incentive awards of $1,000 are unfair.

Plaintiffs counter that several factors support a finding that the settlement is fair. First, they argue that the low objection rate demonstrates that this settlement is fair. See LivingSocial, 2013 WL 1181489 at *23. But this proves little. Although the D.C. Circuit has approved consideration of the objection rate as a factor, it has noted that "caution . . . should be exercised in inferring support from a small number of objectors to a sophisticated settlement." Cobell, 679 F.3d at 923 (quoting GM Trucks, 55 F.3d at 812). Moreover, the objections filed here, though not numerous, were comprehensive and sophisticated. One good objector may be worth many

frivolous objectors in ascertaining the fairness of a settlement. Plaintiffs also argue that the opinion of experienced counsel shows that it is fair. But this factor never weighs against settlement: "the lawyers who negotiated the settlement will rarely offer anything less than a strong, favorable endorsement." ALI Principles § 3.05, cmt. A at 206; see also Kakani v. Oracle Corp., No. 06-6493, 2007 WL 1793774, at *3 (N.D. Cal. June 19, 2007) ("Once the named parties reach a settlement in a purported class action, they are always solidly in favor of their own proposal."). And the experienced counsel representing one of the objectors holds a less-than-charitable opinion of the settlement's fairness. Accordingly, this factor also proves very little.

Plaintiffs also contend that the value of the settlement, set against the strength of the case, shows that it is fair—their assessment of the low value of the class-wide damages claim indicates that getting even the injunction is a good result. See LivingSocial, 2013 WL 1181489 at *23. But this argument rests on the accuracy of the assessment of the class-wide damages claims, and the Court cannot determine on this record whether counsel's assessment is accurate. If redefinition of the class could result in a viable (b)(3) class, then plaintiffs have achieved a poor result by bargaining away valuable monetary claims in return for purely forward-looking nonmonetary relief. Hence, because of the difficulty in assessing on this record the proper value of the class-wide damages claim negotiated away by plaintiffs, this factor does not weigh in favor of the settlement's fairness.

Similarly, plaintiffs argue that the class members are better off with something rather than nothing, and that this settlement is the best possible result obtainable. If the Court approves the settlement, class members get the injunction, but if the Court disapproves the settlement they get nothing. An equally accurate description would be that if the Court approves the settlement,

class members lose any possible monetary recovery and get an injunction of limited value, but if the Court disapproves the settlement perhaps some class members may get a monetary recovery. It may be that no court would certify a (b)(3) class on any definition of the class, or perhaps the evidence would not support monetary damages. But making that determination without a full airing of the issues and without a record on which to base that conclusion disserves absent class members and may deprive them of their due process rights. And this settlement may not be the best result obtainable. For example, by litigating this case through class certification and through final judgment, plaintiffs may be able to obtain the injunction without ceding the class-wide damages claim. Overall, the arguments raised by plaintiffs to show that this settlement is fair are unconvincing, particularly when weighed against the indications of unfairness raised by the objectors. Accordingly, the Court finds that the settlement is not fair, reasonable, and adequate.

## CONCLUSION

Upon consideration of the briefs, the fairness hearing, applicable law, and the entire record herein, the Court will deny plaintiffs' motion for conditional class certification and for final approval of the class settlement. Because the Court declines to certify the class, the Court will also deny plaintiffs' pending motion for attorney's fees as moot. See Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.") (emphasis added). A separate order has issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  November 6, 2013